UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

SUSAN AUGUSTUS,

                      Plaintiff,

                                      **MEMORANDUM & ORDER**
           v.                                    11 CV 15 (MKB)

AHRC NASSAU,

                      Defendant.

----------------------------------------------------------------x

MARGO K. BRODIE, United States District Judge:

       Plaintiff Susan Augustus brings the above-captioned *pro se* action against Defendant AHRC Nassau, her former employer, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"). Plaintiff was terminated by Defendant after a series of alleged disciplinary violations. Plaintiff, who is African-American, claims that Defendant held her to a stricter standard than similarly situated Caucasian co-workers, and that Defendant used her alleged violations as a pretext for race discrimination. Plaintiff also claims she was disciplined and ultimately terminated in retaliation for her advocacy on behalf of a pregnant client's FMLA rights. Defendant moved for summary judgment. The Court heard argument on May 3, 2012. For the reasons set forth below, Defendant's motion for summary judgment is denied.

I. **Background**

    **a. Plaintiff's Employment**

       The following facts are taken from the parties' affidavits, memoranda, exhibits, and Local Rule 56.1 statements. The Court considers the facts in the light most favorable to Plaintiff, who is the non-moving party. *Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

Defendant is an organization that serves adults with developmental disabilities. (Pl.'s Affirm. Opp'n Def.'s Summ. J. Mot. ("Pl.'s. Affirm.") 2; Tr. 32.) Plaintiff began working for Defendant in January 2008 as an Employment Training Specialist ("ETS"). (Compl. ¶ 8; Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 1.) The duties of an ETS include helping clients secure employment and providing related support services. (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶ 2; Def.'s 56.1 ¶ 2.) Of the 13 people employed as ETSs during the time Plaintiff worked for Defendant, three, including Plaintiff, were African-American. (Cohen Aff. Attach., Susan Augustus Dep. ("Augustus Dep.") 38:8–11; Def.'s 56.1 ¶ 3.)

Plaintiff received a positive performance evaluation after her first four months as an ETS and again after her first year. (Pl.'s 56.1 ¶¶ 4, 7; Linder Aff. Ex. B, D.) Plaintiff was also given two "You Make the Difference" awards in June 2009: the first for her "willingness to help when needed" and the second in recognition for going "above and beyond her employment responsibilities" to help a client. (Pl.'s Ex. 47.) The second award noted that Plaintiff "set a wonderful example of what matters the most." (*Id.*)

Plaintiff also received a series of reprimands between September 2008 and November 2009. (Compl. ¶ 8.) Defendant issued two types of written reprimands: "counseling memorandums," which were considered first warnings, and "written supervisions," which were given when a violation was repeated or more serious. (Pl.'s Affirm. Opp'n Def.'s Mem. ("Pl.'s Mem.") 2.) Supervisors had discretion to decide whether and which reprimands were appropriate in any given situation. (Tr. 5:4–7, 10:17–18.) On September 22, 2008, Plaintiff received a counseling memorandum instructing her to be more diligent in providing details of her daily schedule on her Outlook calendar. (Augustus Dep. 56:11–58:13; Linder Aff. Ex. C.)

Sometime in January 2009, Plaintiff asked her supervisors to help ensure that a pregnant client, referred to as A.M., be retained long enough to qualify for FMLA leave.[1] (Augustus Dep. 66:7–68:17.) Plaintiff's supervisor was dismissive of her efforts to help A.M. and remarked that "[A.M.] won't come back." (Augustus Dep. 66:23–68:22.)

Less than a month after Plaintiff's first appeal on A.M.'s behalf, Plaintiff received two written supervisions. (Pl.'s Affirm. 3–4.) On January 26, 2009, Plaintiff had a medical appointment that ran late, causing her to be two hours late for work. (Augustus Dep. 69:21–70:4.) Plaintiff was unable to call a supervisor to say she was delayed because her doctor's office did not permit patients to use cell phones. (*Id.*) Once she arrived at work, Plaintiff offered to make up the two hours by staying late, but her supervisor rebuffed Plaintiff's offer. (Pl.'s Ex. 6.) Plaintiff was issued a written supervision because her "work time was unaccounted for a time span of 2 hours." (Pl.'s Ex. 8.) The written supervision also mentioned Plaintiff's September 22, 2008 counseling memorandum and summarized the scheduling issues that had been noted in that earlier reprimand. (*Id.*)

Three days later, Plaintiff hurt her back while shoveling snow in front of her home. (Augustus Dep. 79:21–23.) Plaintiff tried three times to call a supervisor to report that she was unable to come to work, but each time, Plaintiff left a voicemail message because her supervisor did not answer the phone. (Augustus Dep. 79:11–80:24; Pl.'s Mem. 6; Def.'s 56.1 ¶ 10.) Plaintiff was issued a second written supervision for taking an "unauthorized absence," because she failed "to physically speak with her supervisor." (Pl.'s. Ex. 21; Def.'s 56.1 ¶ 10.)

In April 2009, Plaintiff applied for the position of Job Developer but was told that she was ineligible for consideration because of her written supervisions. (Compl. ¶ 8; Def.'s 56.1

---

[1] It is unclear from the parties' submissions whether A.M. worked directly for Defendant, or was employed at a job site affiliated with Defendant.

¶ 22; Maynard Aff. ¶ 3.) Plaintiff was told that staff who had received written supervisions within the prior year could not be considered for internal vacancies.[2] (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22.)

On June 15, 2009, Plaintiff received a counseling memorandum because she did not properly document her services to a client within 24 hours. (Def.'s 56.1 ¶ 11; Pl.'s Ex. 28.) Plaintiff received a third written supervision on August 7, 2009 because she did not timely document client services a second time. (Pl.'s Ex. 30.)

According to Defendant's "Internal Application Policy & Criteria," an employee with three or more written supervisions cannot be considered for internal vacancies, regardless of when the written supervisions were issued. (Maynard Aff. Ex. 2.) Therefore, the effect of Plaintiff's August 7, 2009 written supervision was that she would never be eligible for any transfer or promotion. (*Id.*)

When A.M. was ready to return to work in September 2009, Plaintiff sought to help her secure a position with similar hours and compensation to the position she held before her pregnancy leave. (Augustus Dep. 66:7–68:17; Def.'s 56.1 ¶ 26.) Plaintiff emailed her immediate supervisor for assistance, and after receiving no response, Plaintiff sent an email to several managers and senior administrators asking for their help. (Pl.'s Exs. 35, 37.) Plaintiff was orally reprimanded by her supervisor for communicating directly with senior management and instructed to refrain from doing so in the future. (Pl.'s Ex. 36.) One of Plaintiff's supervisors suggested she "take a step back," and another told her, "[l]et's advocate for [A.M.'s supervisor] this time." (Compl. ¶ 8; Pl.'s Affirm. 14; Pl.'s Ex. 33.)

---

[2] The record is unclear as to whether the position of Job Developer was lateral to or higher than Plaintiff's position as Employment Training Specialist.

On the afternoon of November 3, 2009, Plaintiff conducted a client field visit. (Augustus Dep. 115:7–23.) When Plaintiff returned to her car sometime after 4:00 p.m., she determined that her supervisor had left a voicemail on her personal cell phone. (Augustus Dep. 115:14–22.) Plaintiff did not immediately return the call, because it was after 4:00 p.m., the matter was "not pressing," and she knew she would be seeing her supervisor the next day. (Augustus Dep. 118:2–6; 120:12–13.) Defendant expected Plaintiff to carry her personal cell phone with her at all times so that her supervisors could reach her. (Pl.'s 56.1 ¶13A; Def.'s 56.1 ¶ 13.) However, Defendant did not supply Plaintiff with a cell phone, nor provide compensation for work calls made on Plaintiff's personal phone. (Tr. 68:10–70:12.)

On November 4, 2009, Defendant was 15 minutes late for a field visit with a client. (Augustus Dep. 121:15–122:6.) The next day, Plaintiff was terminated without explanation. (Pl.'s 56.1 ¶ 21A; Pl.'s Ex. 39.)

### b. Comparative Disciplinary Evidence for Other ETSs

Plaintiff claims that her Caucasian co-workers were not required to account for their time as strictly as she was. (Augustus Dep. 73:12–18, 74:4–78:2). The Outlook calendars of several Caucasian ETSs show multiple gaps, including those of John Gregory, (Pl.'s Ex. 22; Augustus Dep. 99:23–100:22), Shannon Morrison, (Pl.'s Ex. 26), and Blake Worster (Pl.'s Ex. 25).

The record contains additional evidence concerning the disciplinary histories of three other ETSs, all of whom were Caucasian: Frank Gambale, Jack File, and Jennifer Zeitchek.

Gambale was issued a counseling memorandum on March 19, 2008, because his whereabouts were unknown to his supervisor on two occasions. (Pl.'s Ex 19.) After that date, Gambale's Outlook calendar continued to be incomplete. (Pl.'s Ex. 23; Pl.'s. Aff. 8.) In a meeting with supervisors on June 4, 2009, Gambale was reminded to properly maintain his calendar. In addition, notes from that meeting, which were signed and dated by Gambale, stated

5

in bold type, "THIS IS A FINAL NOTICE!!!" (Pl.'s Ex 20.) There is no evidence that Gamble was issued a written supervision. Gambale was subsequently permitted to transfer to another department on August 24, 2009 and was promoted on August 2, 2010. (Pl.'s Ex. 38.)

On March 23, 2009, File was told in a weekly meeting with his supervisor that he needed to fill out his Outlook calendar and that the discussion constituted a "FINAL WARNING!" (Pl.'s Ex. 18.) Plaintiff has presented evidence that, despite this warning, File failed to properly upkeep his calendar in October 2009. (Pl.'s Ex. 24.) On June 25, 2009, File was issued a counseling memorandum regarding overuse of sick time. There is no evidence that he ever received a written supervision. (Pl.'s Ex. 10.) File transferred to the position of Job Developer on May 31, 2009. (Pl.'s Ex. 38.)

On August 5, 2008, Zeitchek was issued a counseling memorandum for submitting inaccurate billing documentation, failing to make two required monthly visits to the worksites of two different clients, and responding "in an inappropriate fashion" when a supervisee brought a problem to her. (Pl.'s Ex. 15.) On October 19, 2009, Zeitchek was issued another counseling memorandum because she used her work computer for non-business reasons on two separate occasions. (Pl.'s Ex. 12.) There is no evidence that Zeitchek was issued a written supervision.

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173 (2d Cir. 2012); *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist.*

*Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 104 (2d Cir. 2011). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see also Redd,* 678 F.3d at 173–74. The Second Circuit has made clear that while summary judgment is available in discrimination cases where there are no genuine issues of material fact, "an extra measure of caution is merited" when considering summary judgment in these cases because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Hotz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)) (hostile work environment claim).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest*.'" *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (alteration in original) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006); s*ee also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("'[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))).

"This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

### b. Title VII Discrimination Claim

Plaintiff claims that Defendant disciplined her excessively for things that were "extremely inconsequential" and ultimately terminated her because of her race. (Compl. ¶¶ 7, 8.) The basis for Plaintiff's race discrimination claim is that Caucasian ETSs who committed comparable violations were not reprimanded to the same extent she was or ultimately terminated. (Compl. ¶ 8; Augustus Dep. 82:15–83:5.)

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S. § 2000e–2(a)(1). Thus, "[a]n employment decision . . . violates Title VII when it is 'based in whole or in part on discrimination.'" *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

Title VII claims are assessed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Cruz v. Coach Stores*, 202 F.3d 560 (2d Cir. 2000). Under the framework, Plaintiff must first establish a prima facie case of discrimination. *Hicks*, 509 U.S. at 506; *see also Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Plaintiff's burden at this stage is "minimal." *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506). If Plaintiff satisfies this initial burden, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. Defendant's burden "is not a particularly steep hurdle."

8

*Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. March 24, 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center,* 509 U.S. at 509)). If Defendant offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied, however, if Plaintiff can show that "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [her] dismissal was motivated at least in part by [race] discrimination." *Adamczyk v. N.Y. Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)).

### i. Prima Facie Case

To establish a prima facie case of employment discrimination under Title VII, Plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150; *see* Ruiz, 609 F.3d at 491–92.

Defendant concedes that Plaintiff satisfies the first three elements of her prima facie discrimination case: she is African-American, she was uncontestably qualified to be an ETS, and the disciplinary actions taken against her, along with her termination, constituted adverse employment actions. *See Gladwin v. Pozzi*, 403 F. App'x 603, 606 (2d Cir. 2010) (an African-American woman who was terminated from her job satisfied the first and third elements of her prima facie case); *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (discharge, refusal to promote, and reprimands are adverse employment actions). (Def.'s Mem. of Law ("Def.'s Mem.") 9.) Defendant argues, however, that Plaintiff cannot show that the disciplinary actions

and eventual termination occurred under circumstances giving rise to racial discriminatory intent. (Def.'s Mem. 9; Def.'s Reply Mem. of Law ("Def.'s Reply Mem.") 10.)

Defendant concedes that an inference of discrimination can be raised by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside [her] protected group." *Ruiz*, 609 F.3d at 493 (internal quotation marks omitted); *see* Def.'s Reply Mem. 10. Such a showing "is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz*, 609 F.3d at 493 (internal quotation marks omitted). Defendant argues, however, that the employees that Plaintiff seeks to compare herself with are not similarly situated, because they were not disciplined as often as Plaintiff and did not engage in similar conduct under similar circumstances, and, therefore, cannot be compared to Plaintiff. (Def.'s Reply Mem. 11–12; Tr. 24–33.)

Those with whom Plaintiff compares herself must be "similarly situated in all material respects," meaning that they were "subject to the same performance evaluation and discipline standards" as Plaintiff and "engaged in comparable conduct." *Graham v. Long Island R.R.,* 230 F.3d 34, 39–40 (internal quotation marks omitted). Defendant is correct in asserting that the other employees were not disciplined as often as Plaintiff; however, Plaintiff is alleging these disciplinary violations were the result of discriminatory treatment and that similarly situated employees, who engaged in similar or worse conduct, were not disciplined as often or as severely as she was.

The evidence supports Plaintiff's argument that she was treated less favorably than Caucasian ETSs for similar violations of company policies. (Augustus Dep. 96:18–21, 143:15.) For example, inconsistencies in Plaintiff's Outlook calendar were cited in her September 22, 2008 counseling memorandum, her January 26, 2009 written supervision, and in Defendant's

internal memorandum explaining its decision to terminate Plaintiff.[3]  (Pl.'s Exs. 46, 8, 32.)  But the Outlook calendars of Caucasian ETSs also show multiple inconsistencies, for which they appear to have been disciplined less harshly than Plaintiff.  Frank Gambale and Jack File were both given final warnings about their failure to properly maintain their Outlook calendars, yet both failed to maintain their calendars properly, even after multiple warnings.  (Pl.'s Affirm. 7–9; Pl.'s Ex. 19, 23, 20, 18.)  Unlike Plaintiff, who received counseling memoranda and written supervisions and was ultimately terminated, Gambale only received a counseling memorandum and was ultimately promoted.  (Pl.'s Affirm. 8–9; Pl.'s Exs. 19, 38.)  There is no evidence File received a counseling memorandum or that File or Gambale received written supervisions.  (Pl.'s Affirm. 8–9.)

      Defendant asserts that Plaintiff and Gambale were treated the same, as they "both . . . received counseling memorandums, not written supervisions, for failing to properly fill out their Outlook Calendar."  (Def.'s Reply 11.)  Defendant points out that "Plaintiff thereafter again failed to provide proper documentation, which resulted in a written supervision."  (*Id.*)  Defendant's attempt to distinguish Plaintiff from Gambale is unpersuasive, as Plaintiff has presented evidence that, following Gambale's receipt of the counseling memorandum on March 19, 2008, he did not improve his Outlook upkeep.  (Pl.'s Affirm. 8; Pl.'s Ex. 23.)  The June 4, 2009 weekly meeting agenda for Gambale indicates, among other things, it was his "FINAL

---

[3] According to Defendant, "[t]hat other employees may have had hours missing on their Outlook calendars is not probative of, nor does it even raise an inference of discrimination, because none of Plaintiff's three written supervisions were based solely on her Outlook calendar, and the events of November 3 and 4, which led to her termination, were likewise not based solely on her failure to properly fill out her Outlook calendar." (Def.'s Reply Mem. 5.)  The gaps in Plaintiff's Outlook calendar were part of her alleged failure to properly communicate with her supervisors, and the reprimands she received for not properly maintaining her calendar were included in her termination recommendation.  Therefore, the treatment of other employees who also had missing hours on their Outlook calendars bears on Plaintiff's claim that she was punished more severely than other ETSs for similar violations of company policies.

NOTICE" regarding the proper upkeep of his Outlook calendar. Thus the record, read in the light most favorable to Plaintiff, indicates that both Plaintiff and Gambale failed to properly maintain their Outlook calendars after they received counseling memoranda, however, Gambale received a final warning, while Plaintiff received a written supervision. Plaintiff has also presented evidence that File also failed to properly maintain his Outlook calendar after receiving a "FINAL NOTICE" regarding its proper upkeep during his weekly meeting on March 23, 2009. (Pl.'s Ex. 24.)

Other actions taken by Defendant also suggest that Plaintiff was treated less favorably than similarly-situated Caucasian co-workers. Plaintiff received a written supervision on January 26, 2009, because she was late in returning from a doctor's appointment, and another written supervision three days later because she left a voicemail message about needing to take a sick day, after several attempts to speak to a supervisor, instead of actually speaking to a supervisor. (Pl.'s 56.1 ¶ 10A.) On the other hand, Jennifer Zeitchek was issued only one counseling memorandum, a less severe reprimand, for submitting inaccurate billing documentation, failing to visit clients at their job sites, and responding "in an inappropriate fashion" to a supervisee. (Pl.'s Ex. 15.)

Defendant argues that no other ETS engaged in similar conduct under similar circumstances, as "[n]o other ETS . . . blatantly disregarded specific verbal and written instructions by her supervisors to do something." (Tr. 32:4–11.) However, as stated above, Plaintiff has presented evidence that both Gambale and File failed to properly maintain their calendars after receiving specific instructions to do so. Plaintiff has also presented evidence that Gambale, File, Gregory, Worster, and Morrison failed to properly complete their Outlook calendars after being specifically instructed to do so in a department wide email sent on October 9, 2009. (Simmons Aff. Ex. C; Pl.'s Exs. 22–26.) Plaintiff has presented sufficient evidence

12

from which a jury could reasonably find that she was reprimanded more often and more severely than her Caucasian colleagues, and that her disciplinary record and termination resulted, at least in part, because of racial discrimination.[4]

### ii. Proffered Legitimate Reason for Adverse Action

Since Plaintiff has established a prima facie case of discrimination, a presumption of discrimination arises, and Defendant must articulate a "legitimate, non-discriminatory reason for the employment action." *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 527 (2012) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). Defendant claims that Plaintiff was terminated because of her failure to properly communicate with her supervisors, as outlined in Plaintiff's two counseling memoranda and three written supervisions, along with other alleged violations of Defendant's policies, including: continued gaps in her Outlook calendar, failing to carry her personal cell phone with her at all times, and not returning her supervisor's November 3, 2009 phone call. (Pl.'s Ex. 32; Def.'s 56.1 ¶¶ 13, 15, 16, 17–18, 20–21.) Thus, Defendant satisfies its burden. Plaintiff must, therefore, meet her burden of demonstrating that the legitimate reason proffered by Defendant "was merely a pretext for discrimination." *Clayborne v. OCE Bus. Servs.* 381 F. App'x 32, 33–34 (2d Cir. 2010).

---

[4] Defendant also argues that Plaintiff does not establish a prima facie case for discrimination because the supervisors who allegedly discriminated against her are the same people who hired her and gave her complimentary performance evaluations. (Def.'s Mem. 9–11.) Defendant misunderstands Plaintiff's minimal burden at this stage of the analysis. While the "same actor" inference may in some cases "suggest that invidious discrimination was unlikely," the Second Circuit has cautioned that "each case must involve an examination of all the circumstances." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997); *see also Feingold v. New York*, 366 F.3d 138, 154 n.15 (2d Cir. 2004) (declining to decide whether same actor inference applies to Title VII claims); *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 351 (S.D.N.Y. 2009) ("[A]s several courts have found, the same-actor inference is permissive, not mandatory."). Here, Plaintiff has met her burden by presenting evidence from which a reasonable jury could draw an inference of discrimination.

### iii. Pretext

To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that racial discrimination played a role in the Defendant's disciplinary actions and termination of her employment. *Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008). A "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Id.* at 138. "The plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004).

A rational juror could conclude that Defendant's proffered non-discriminatory explanation is pretext for prohibited race discrimination. Many of the incidents that led to Plaintiff's reprimands could reasonably be perceived as minor — *e.g.*, short gaps in her Outlook calendar, being late to work after a doctor's appointment, calling the office three times to report she was injured shoveling snow and leaving a message after not being able to reach a supervisor, deciding not to return a call to her supervisor after 4:00 p.m. because she knew that she would see her the following day — especially when compared to similar violations by other ETSs who were less severely punished.

Defendant argues that it is entitled to summary judgment because the ETSs with whom Plaintiff compares herself were not similarly situated in all material respects. (Def.'s Reply Mem. 12–13.) This argument merely identifies additional issues of fact to be determined by a jury. *Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."). Specifically, a jury must assess Defendant's claims that none of the other ETSs "displayed the flagrant disregard of their supervisors' instructions,

nor were they disciplined less severely than Plaintiff for similar conduct under the circumstances." (Def.'s Reply Mem. 12.) Since part of Plaintiff's evidence is that Caucasian ETSs often received no reprimand for similar conduct, this is an issue of fact that must be decided by a jury.

Finally, Defendant argues unpersuasively that Plaintiff's claim cannot withstand summary judgment because the two African-American ETSs who worked with Plaintiff did not receive written supervisions. (Def.'s. 56.1 ¶ 24; Def.'s Mem. 11.) To the contrary, only a jury can determine whether there is any relevant inference to be drawn from this fact. Plaintiff need only prove that race was "at least one of the motivating factors" behind the adverse employment actions to which she was subjected. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (internal quotation marks omitted). Whether other employees experienced discrimination is not dispositive.

Reviewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in favor of Plaintiff, a reasonable jury could find that Defendant's actions towards Plaintiff were motivated by discriminatory animus.

### c. Retaliation Claim

Plaintiff claims that Defendant violated the FMLA by retaliating against her because of her persistent advocacy on behalf of A.M.'s FMLA rights.[5] (Compl. ¶ 8.) Under the FMLA, it

---

[5] Plaintiff also alleges that she was retaliated against for asking that Defendant provide better lighting at one of its outdoor job sites. (Compl. ¶ 8.) While Plaintiff does not specify the law under which she brings this claim, the Court construes it as a claim under the Occupational Safety and Health Act ("OSHA"). *See* 29 CFR § 1926.26 (setting forth "minimum illumination intensities" for work areas); 29 U.S.C. § 660(c)(1) (prohibiting retaliation against any employee for protesting violations of any requirements under the Act). Plaintiff cannot sustain this claim in federal court, because the exclusive remedy for retaliation under OSHA is to file an administrative complaint with the Secretary of Labor. 29 U.S.C. § 660(c)(2). There is no private right of action under OSHA. *Rompalli v. Portnova*, No.09 Civ. 3083, 2010 WL 2034362, at *2 (S.D.N.Y. May 21, 2010) (citing *Donovan v. Occupational Safety and Health Review Comm'n*,

is illegal "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2); *see also* 29 C.F.R. § 825.220(a)(2) ("An employer is prohibited from discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the [FMLA].").[7]

FMLA retaliation claims are analyzed under the *McDonnell Douglas* framework. *Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir. 2004); *see also Riddle v. Citigroup*, 449 F. App'x 66, 70 (2d Cir. 2011) (citing *Potenza*, 365 F.3d 168).

### i. Prima Facie Case

To establish a prima facie case of FMLA retaliation, Plaintiff must show: (1) she "exercised rights protected under the FMLA"; (2) she "was qualified for [her] position"; (3) she "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Cooper v. N.Y. Nurses Ass'n*, 847 F. Supp. 437, 446 (E.D.N.Y. Mar. 16, 2012) (quoting *Potenza*, 365 F.3d at 168). Since there is no dispute that Plaintiff was qualified to be an ETS and suffered adverse employment actions, the only issues to be determined are whether Plaintiff exercised rights protected under the FMLA and whether the adverse employment action occurred under

---

713 F.2d 918, 926 (2d Cir.1983)). In any event, at oral argument, Plaintiff stated that she is not bringing an OSHA claim. (Tr. 54:11–16.)

[7] An employee is eligible for FMLA benefits once she has been employed by an employer for at least 12 months, and has worked at least 1,250 in the previous 12-month period. 29 U.S.C § 2611(2)(A); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 715 (2d Cir. 2001). An eligible employee is entitled to 12 weeks of leave during a 12-month period in order to care for the employee's newborn child. 29 U.S.C. § 2612(a)(1)(A); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). An employee returning from FMLA leave is entitled "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B); *Peterson v. Long Island R.R.*, No. 10 Civ.480, 2012 WL 2319238, at *6 (E.D.N.Y. June 19, 2012).

circumstances giving rise to an inference of retaliatory intent. For the reasons discussed below, the Court finds that these elements are satisfied.

### 1. Exercise of a Right Protected Under the FMLA

Plaintiff asserts that she was seeking to obtain certain protections for A.M., a pregnant client and fellow employee, and that Defendant retaliated against her for advocating for those rights on behalf of the employee.[8] Specifically, Plaintiff claims that when she learned that A.M. was pregnant, she "immediately wanted [A.M.] to get qualified for the [FMLA]." (Augustus Dep. 66:19–20.) Plaintiff believed Defendant did not want to retain A.M. based on negative comments made by supervisors, including the comments from a supervisor who told Plaintiff, "[A.M.] won't come back." (Augustus Dep. 67:2–3, 66:23–68:6.) When A.M. returned to work, Plaintiff protested what Plaintiff perceived as Defendant's attempt to deny A.M. her FMLA rights. (Augustus Dep. 151:21–155:15; Compl. ¶ 8.) Therefore, for the purposes of establishing a prima facie case, Plaintiff exercised a right protected by the FMLA, because she had a "good faith, reasonable belief" that Defendant's actions towards A.M. violated the FMLA. *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 191 (E.D.N.Y. 2011) (noting plaintiff need not show that challenged conduct was in fact a violation of the statute) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). Furthermore, Plaintiff is entitled to bring a retaliation claim even though the challenged employment practice was directed at A.M., another employee. *Lopez v. Four Dee, Inc.*, No. 11 Civ. 1099, 2012 WL 2339289, at *1–3

---

[8] Although it is not entirely clear from the record whether A.M. was technically employed by Defendant, Plaintiff has, at the very least, raised an issue of fact as to whether an employment relationship existed between Defendant and A.M., since it appears that Defendant had some degree of control over the terms of A.M.'s employment. *See Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 113–114 (2d Cir. 2000) (finding employment relationship existed where defendant exercised "a great deal of control over the 'manner and means' by which" the individual accomplished his tasks) (citing *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 740–41 (1989)). For the purposes of this decision, the Court assumes A.M. was an employee of Defendant.

(holding plaintiff can proceed on her own FMLA retaliation claim where plaintiff alleged that she was terminated as a result of another employee's exercise of FMLA rights). Plaintiff was therefore exercising a right that was protected under the FMLA when she advocated on behalf of A.M.'s rights. Defendant does not dispute that such advocacy took place. (Def.'s Mem. 16.)

### 2. Inference of Retaliatory Intent

Plaintiff claims that she began receiving "an onslaught" of reprimands for "extremely inconsequential" violations of company policies at the same time she started advocating for A.M.'s rights. (Compl. ¶ 8.) Within a month of advocating for A.M.'s FMLA rights, Plaintiff received two written supervisions. Plaintiff's final email advocating for A.M. was sent to her supervisor on October 14, 2009, approximately three weeks before she was terminated. (Pl.'s Ex. 33.) The Second Circuit has held that the "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Plaintiff meets her minimal burden of presenting sufficient facts from which a rational juror could infer that the Defendant acted with retaliatory intent.

### ii. Proffered Legitimate Reason for Adverse Action

Defendant claims that Plaintiff was terminated because of her failure to properly communicate with her supervisors, as outlined in Plaintiff's two counseling memoranda and three written supervisions, along with other alleged violations of Defendant's policies. *See supra* Part II(b)(ii). Thus, Defendant satisfies its burden.

### iii. Pretext

Defendant argues that Plaintiff cannot provide any evidence that its "well documented and non-discriminatory reasons for the termination" were pretext. (Def.'s Mem. 16–17.) Although Defendant concedes that Plaintiff advocated for A.M. weeks prior to her termination,

Defendant argues, correctly, that "temporal proximity, without more, 'is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext' at the third stage of the McDonnell Douglas inquiry." *Aka v. Jacob K. Javits Convention Ctr. of N.Y.*, No. 09 Civ. 8195, 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011); *see El Sayed*, 488 F. Supp. at 933 ("The temporal proximity of events . . . without more, . . . is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."). Here, in addition to the temporal proximity between Plaintiff's protected activity and Defendant's challenged actions, Plaintiff has presented evidence that supervisors made negative comments and expressed frustration with her advocacy on behalf of A.M.'s rights. Moreover, to the extent that the other Caucasian ETSs discussed above did not advocate for FMLA rights, Plaintiff's differential treatment is additional evidence of retaliation. Therefore Plaintiff has presented sufficient evidence to raise an issue of fact as to Defendant's retaliatory intent.

Resolving all ambiguities and drawing all inferences in Plaintiff's favor, the Court finds sufficient evidence from which a rational juror could find that Defendant retaliated against Plaintiff because of her attempts to ensure and enforce the rights of A.M. under the FMLA.

### III. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is denied as to all claims.

SO ORDERED.

s/MKB<br>
MARGO K. BRODIE<br>
United States District Judge

Dated: December 11, 2012
      Brooklyn, New York