UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

SUSAN AUGUSTUS,

                    Plaintiff,

               v.

AHRC NASSAU,

                    Defendant.

-----------------------------------------------------------------x

**MEMORANDUM & ORDER**
11-CV-0015 (PKC)

PAMELA K. CHEN, United States District Judge:

On January 6, 2011, Plaintiff Susan Augustus, acting *pro se*, filed her complaint against Defendant AHRC Nassau, her former employer, pursuant to Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Family and Medical Leave Act of 1993, codified at 29 U.S.C. § 2601 *et seq*. ("FMLA"). In this action, Plaintiff alleges that: (1) AHRC Nassau discriminated against her on the basis of race by imposing stricter performance standards on her than her Caucasian co-workers, which resulted in a series of disciplinary actions and ultimately her termination; and (2) AHRC Nassau retaliated against her in a similar manner based on Plaintiff's advocacy on behalf of a pregnant client regarding the client's FMLA rights. (Dkt. 1 ("Compl.") at 2–3; Trial Transcript ("Tr.") at 5–8 (Plaintiff's opening statement)).

On August 17–19, 2013, the Court conducted a three-day bench trial in this action. Plaintiff testified on her own behalf and called five other witnesses, all current or former employees of AHRC Nassau. Defendant cross-examined Plaintiff's witnesses, most of whom Defendant had intended to present as its own witnesses. Defendant did not call any additional

witnesses in its case. Both parties introduced, and adduced testimony about, numerous documentary exhibits.

The Court makes the following findings of fact and conclusions of law. Only those facts the Court deems necessary for the resolution of the remaining claim will be discussed.

## I.    Findings of Fact

### A.    AHRC Nassau

AHRC Nassau is an organization based in Nassau County, New York, that provides services for children and adults with intellectual disabilities. (Tr. at 226–27.) AHRC Nassau provides a wide range of services that includes schooling and other educational programs, residential programs, vocational training, and employment services. (Tr. at 227–29.) In addition to assisting AHRC Nassau clients find and maintain employment in the community, AHRC Nassau operates vocational centers where clients work and learn job skills that they can use in the community. (Tr. at 228–29.) AHRC Nassau employs approximately 3,000 people. (Tr. at 228.)

### B.    Plaintiff's First Year at AHRC Nassau: January 2008 to January 2009

#### 1.    AHRC Nassau Hires Plaintiff

On January 7, 2008, Plaintiff began working at AHRC Nassau as an Employment Training Specialist ("ETS") 1 in the Supported Employment Program ("SEP") unit. (Tr. at 53, 355); Joint Pretrial Order ("JPTO")[1] at 3; Pl. Ex. 2.) ETS 1s are primarily responsible for the initial phase of the client's programming, which includes assessment, evaluation, development,

---

[1] The parties stipulated to certain facts in the JPTO.

job coaching, and securing placements.  (Tr. at 116; JPTO at 3; *see* Pl. Ex. 1.)[2]  The ETS 1 Job Description specifically indicates, among other things, that "advocat[ing] for individual rights at the worksite and in the community" comprises 5% of the position.  (Pl. Ex. 1 at 1.)  During the time that Plaintiff was employed at AHRC Nassau, it employed approximately 13 ETSs, three of whom, including Plaintiff, were African-American.[3]  (JPTO at 3.)

Christina Murgola, the Program Administrator for the SEP unit, and Desiree Linder[4] interviewed Plaintiff for the ETS position.  (Tr. at 226, 229, 234; JPTO at 3.)  Murgola, along with her supervisor, Sabine Maynard, the Assistant Director of Vocational Services, made the decision to hire Plaintiff.  (Tr. at 225–26, 235, 383–84.)  Murgola recommended hiring Plaintiff over a Caucasian female candidate whom Murgola also had interviewed for the position.  (Tr. at 235.)

Plaintiff worked at AHRC Nassau for a year and eleven months.  (JPTO at 3.)  During that time, Plaintiff had two direct supervisors: Linder and Dana Simons.  Linder was Plaintiff's supervisor between January 2008 and approximately August 2009.  (Tr. at 32.)  Simons was Plaintiff's supervisor between August 2009 and November 2009.  *Id.*  In addition, Murgola intermittently filled in as Plaintiff's direct supervisor.  (Tr. at 437.)  Linder, Simons, Murgola, and Maynard are white.

---

[2] There are two levels of ETS positions: ETS 1 and ETS 2.  ETS 2s are responsible for overseeing larger caseloads and providing "follow along support, which would be provision of services for individuals that were maintaining employment."  (Tr. at 116.)

[3] The trial testimony varies from the parties' stipulation on this issue.  Maynard testified that there were eight or nine ETSs in the Supported Employment program when Plaintiff worked there (Tr. at 509), and Murgola testified that there are currently eight ETSs in that program.  (T. at 229.)

[4] Linder's last name is now "Winters."  (Tr. at 767.)  However, she will be referred to as "Linder" in this Memorandum and Order.

Plaintiff had a caseload of developmentally disabled individuals ("clients"). (JPTO at 3.) Plaintiff "loved" her job. (Tr. at 17.) She came to work early, and worked on weekends. *Id.* She went "above and beyond" for her clients and co-workers, including throwing a baby shower for a client, A.M.,[5] collecting money from co-workers for gift cards for clients, and contributing money toward gifts for co-workers. (Tr. at 17–18.) Plaintiff also made numerous suggestions on providing additional skills and educational training for clients. (Tr. at 18–19.)

## 2. *May 2008: Plaintiff's First Evaluation*

In May 2008, after approximately five months on the job, Plaintiff received her first performance evaluation, which was positive. (Pl. Ex. 3.) Of the 40 performance indicators, Plaintiff received a rating of "Meets Expectations" for 31, "Above Expectations" for eight, and "Not Applicable" for one. (*Id*. at 2-3.) Among the criteria for which Plaintiff received an "Above Expectations" rating were: "Utilizes time effectively;" "Displays initiative;" and "Follows agency code of conduct policy and procedure." (*Id*. at 3.) The evaluation also was replete with positive comments, including that Plaintiff was (1) "eager to broaden her understanding of her current responsibilities;" (2) "open to suggestions and [] receptive to supervisory feedback;" (3) "kind and considerate to her peers and individuals in our program;" and (4) "able to complete work in a timely and thorough manner;" and that she (5) use[s] initiative to clarify any uncertainties." (*Id*. at 2–3.) The "Overall Comments" section of the evaluation read: "Ms. Augustus has demonstrated an overall good work ethic and positive attitude. She is able to effectively utilize her time to provide support and assistance to peers and program participants. Ms. Augustus is a responsible and dependable employee. She is a welcomed addition to the Supported Employment program." (*Id*. at 3.) Although the evaluation

---

[5] During the trial, AHRC Nassau's clients were referred to by their initials or first names to protect their privacy.

was overwhelmingly positive, the evaluation did set forth as a goal and recommendation that Plaintiff "keep the lines of communication open when considering the relevant professional staff involved in an individual[']s support team." (*Id.* at 3.)

Linder, who was Plaintiff's immediate supervisor at the time, prepared the May 2008 evaluation. (Tr. at 825–26.) Linder, Murgola, and Maynard all signed the evaluation. (Pl. Ex. 3 at 3.) Murgola and Maynard added handwritten notes to the evaluation thanking Plaintiff, respectively, for her "dedication" and "all you do!" (*Id.*)

3. *September 2008: Counseling Memorandum Regarding Communication*

Around the same time as her May 2008 evaluation, Plaintiff began receiving requests from her supervisors to improve her communication with them about her time and her whereabouts. (Pl. Ex. 8.) At support meetings held on May 16, 2008, July 24, 2008, and September 3 and 4, 2008, Plaintiff was advised of the need to keep her supervisors apprised of her whereabouts in a timely manner. (Pl. Exs. 8 and 45; Tr. at 269, 290, 519, 825–826.) During the support meeting in May 2008, Linder specifically discussed with Plaintiff the need to call Linder on the day she is sick if she is not coming to work. (Tr. at 821.) The items addressed at each support meeting were recorded in written minutes, which were signed by Plaintiff. (Pl. Ex. 45.) The meeting minutes for July 24, 2008 included the item, "Outlook calendar, schedule adjustment. Please notify myself [Linder] or Christina [Murgola] if you change your agenda." (Pl. Ex. 45 at 2; Tr. at 802.) The minutes for "September 3/4, 2008" also indicated: "Outlook Calendar-Please have all time accounted for daily." (Def. Ex. R at 3.)

On September 22, 2008, Plaintiff received her first Counseling Memorandum[6], which memorialized a meeting between Linder and Plaintiff on September 16, 2008 regarding communication and scheduling documentation issues. (Pl. Ex. 46.) At the September 16 meeting, Linder counseled Plaintiff that her daily schedule had to be detailed in her Outlook calendar and that she needed to advise her supervisors of changes in her schedule. *Id.* Plaintiff had emailed Linder on September 16 to advise Linder that she (Plaintiff) had been sick the day before and had not gotten to any of her appointments that day. (Tr. 822–25; Def. Ex. Z; Pl. Ex. 46.) Linder decided to give Plaintiff a Counseling Memorandum in September 2008 because of the prior discussions with Plaintiff on the communication issue. (Tr. at 805, 821–25.)

The September 22 Counseling Memorandum, which was directed to Plaintiff from Linder, stated, in part:

> We have *repeatedly* discussed the importance of the use and detail of the calendar at our weekly support meetings. However, you have been inconsistent in your completion of it. It is important that when you deviate from your established schedule, that you notify your supervisor in a timely manner. In the event that individuals on your caseload need your assistance, it is important for us to know your whereabouts as their needs present themselves.
>
> I understand that situations will arise that may be urgent; I ask that you telephone the Freeport Vocational Center and leave a message or speak to staff to indicate the change in your schedule.
>
>                 * * *
>
> As you are aware, this is a concern and your immediate and ongoing cooperation in this matter is expected.

*Id.* (emphasis added).[7]

Between September 2008 and January 2009, there were no instances of Plaintiff's whereabouts being unaccounted for. (Tr. at 777.)

---

[6] A Counseling Memorandum, while serious, is less severe than a Written Supervision. (Tr. at 90.)

[7] Plaintiff testified at trial that she did not recall the substance of the September 16 meeting with Linder, even after reviewing the September 22 Counseling Memorandum. (Tr. at 58; Pl. Ex. 46.)

C.     Plaintiff's Second Year at AHRC Nassau: January 2009 to November 2009

1.     *January 2009:  Plaintiff's Second Performance Evaluation*

In January 2009, Plaintiff received her second performance evaluation, after having worked a full year at AHRC Nassau.  Linder prepared Plaintiff's evaluation on or about January 6, 2009, and reviewed it with Plaintiff on January 22, 2009.  (Tr. at 60–61; JPTO at 4; Pl. Ex. 4.)[8]  This evaluation was comparable to Plaintiff's positive May 2008 evaluation, except that she received one rating of "Not Meeting Expectations" in the category of "Seeks to improve job knowledge through observation and questions."[9]  (Pl. Ex. 4.)  The evaluation contained numerous positive comments, including:  "Ms. Augustus is eager to expand on her employment knowledge.  She treats the individuals on her caseload with dignity and respect and ensures that their safety and needs are met.  She brings creative ideas to the Supported Employment Department and helps to encourage growth within our program.  Ms. Augustus strives to support our individuals so that they can continue to be productive, independent members of the community."  *Id*. at 3.

The evaluation also noted issues with communication: (1) "at times communication needs to be reinforced;" (2) "Ms. Augustus needs to continue to inquire when responsibilities are uncertain and keep her supervisor updated of changes/concerns regarding her caseload or schedule;" and (3) "Ms. Augustus needs to keep lines of communication open so that agency personnel, family members, and outside advocates are aware of any changes or updates."  *Id*. at 1–2.  During the review of Plaintiff's evaluation, Linder and Plaintiff discussed the need for

---

[8] Although Plaintiff suggested at trial that there was an improper reason for this time lapse, the explanation for it was benignly bureaucratic.  (Tr. at 469–71).

[9] Of the 40 performance indicators, Plaintiff received a rating of "Meets Expectations" for 28, "Above Expectations" for ten (reflecting an improvement in two categories), "Expectations Not Met" for one, and "Not Applicable" for one.  (Pl. Ex. 4.)

Plaintiff to keep her supervisors aware of changes in her schedule, "but Plaintiff did not think the issue was that big a deal." (JPTO at 4; Tr. 60–61.)

### 2. *Plaintiff's First Written Supervision*

On January 23, 2009, the day after her performance evaluation review, Plaintiff arrived to work late, following a doctor's appointment. (Tr. at 61, 826.) Because she had forgotten about the appointment, Plaintiff did not notify Linder until 9:00 that morning, via voicemail, that she (Plaintiff) had a doctor's appointment from 9:00 a.m. to 12:00 p.m. (Tr. at 61–62, 245; JPTO at 4.) However, Plaintiff arrived at work at 2:00 p.m., and did not call to advise Linder that she would be later than expected. *Id.*

Linder met with Plaintiff after she arrived at work to discuss Plaintiff's failure to account for her time between 12:00 and 2:00 p.m. Linder initially did not intend to issue a Written Supervision.[10] (Tr. at 828.) However, Linder decided to issue the Written Supervision because Plaintiff appeared not to appreciate the seriousness of the issue, and did not apologize or show remorse. (Tr. at 828; JPTO at 4.) Linder's perception about Plaintiff's lack of remorse was based on Plaintiff's "body language," *i.e.*, "turning her body away . . . , rolling her eyes, [and] facial expression of disgust. You know, there was no longer a conversation. It just became almost very defensive." (Tr. 827–29; Pl. Ex. 6.) Plaintiff also responded to Linder's criticism, by stating, in part, that "everyone else just comes in whenever they feel like it." (Pl. Ex. 6.)

After the January 23 meeting, Linder prepared a Written Supervision ("First Written Supervision"), which was provided to Plaintiff on January 26, 2009. Linder and Maynard met with Plaintiff the same day to discuss the First Written Supervision. During the meeting, Linder

---

[10] A Written Supervision is the most severe form of discipline, short of termination, possible at AHRC Nassau. (*See* Tr. at 359.)

noted that she and Plaintiff had spoken numerous times about communication. (Pl. Ex. 7.)[11]
Maynard asked Plaintiff if she had any questions, if she was surprised, and whether she was
happy in her position. *Id*. Plaintiff responded that she was in shock and thought that she had
been communicating sufficiently. She also stated that she loved her job. *Id*. Maynard asked if
Plaintiff needed any help from the supervisors, to which Plaintiff responded that she felt that she
had received enough help. Maynard also told Plaintiff that she (Plaintiff) had a lot to offer the
program. *Id*. Maynard and Linder stressed the need for immediate improvement with respect to
communication. *Id*.

The First Written Supervision noted that Plaintiff's "work time was unaccounted for [for]
a time span of 2 hours" on January 23, 2009. (Pl. Ex. 8.) It also noted the September 2008
Counseling Memorandum that Plaintiff had received based on her failure to account for her
schedule. The First Written Supervision set forth several requirements for "immediate and
consistent improvement," including that Plaintiff "physically speak with her supervisor should
[she] be late or absent." *Id.*

Plaintiff did not seek to formally rebut the First Written Supervision because she did not
believe, at that time, that it was motivated by any improper purpose. (Tr. at 109–10; JPTO at 4.)

### 3. Plaintiff's Second Written Supervision

On January 28, 2009, two days after receiving the First Written Supervision, Plaintiff did
not come to work due to weather conditions and a back injury she suffered while shoveling
snow. (Tr. at 31, 103; JPTO at 4.) Plaintiff left two voicemail messages on Linder's office
phone, the first one indicating that she (Plaintiff) would be late due to the weather and the

---

[11] Plaintiff's Exhibit 7 is Linder's memorandum documenting the January 26, 2009 meeting.

second, at approximately 9:00 a.m., indicating that she would not be coming to work at all that day. (Tr. at 104, 846; JPTO at 4.) Linder received the two messages, and called the Plaintiff, who did not answer. *Id.* Linder left a voicemail asking Plaintiff to return the call. *Id.* Approximately two hours later, Plaintiff left a third voicemail message indicating that she would like to take a sick day. *Id.* Linder and Plaintiff did not speak directly that day. *Id.*

On January 29, 2009, Plaintiff received a second Written Supervision ("Second Written Supervision") based on the events of the day before. (Pl. Ex. 21.) The Second Written Supervision was based on Plaintiff's failure to follow the directive from the First Written Supervision that Plaintiff "physically speak with her supervisor should she be late or absent." *Id.* The Second Written Supervision explained that "[t]his communication must be done person to person[,] not by means of a message[.]" *Id.* It further noted that, in the event her direct supervisor is unavailable, Plaintiff may speak to another supervisor or ask to have an administrator paged to the operator. *Id.*

Linder believed the Second Written Supervision was necessary because Plaintiff had been directed in the First Written Supervision to physically speak to a supervisor if she was going to be late or absent, and yet only days later, left Linder voicemail messages about being late and absent, and failed to take steps to ensure that she (Plaintiff) actually spoke to Linder. (Tr. 245–49, 831; Pls. Ex. 8.) Plaintiff could have called Linder on Linder's cell phone; Linder had given her cell phone number to all of the ETSs, including Plaintiff. (Tr. 66, 798, 831.) Plaintiff did not seek to have the AHRC Nassau switchboard operator page Linder on January 28, 2009, even though she was aware that she could have done so; nor did she attempt to speak to another supervisor. (Tr. 66–70.)

Plaintiff did not seek to rebut the Second Written Supervision because "being naïve," she did not believe it was necessary at the time.  (Tr. at 109–10; JPTO at 4.)

Plaintiff's conduct in late January 2009 prompted a review of "call-out"[12] procedures during a department meeting involving all of the ETSs, including Plaintiff, on February 2, 2009.  (Tr. at 241–42; Pl. Exs. 8, 21; Def. Exs. K, L.)  At the meeting, Plaintiff and the other ETSs received a document setting forth AHRC Nassau's call-out policy, which requires, among other things, that an employee who is going to be late or absent must physically speak to his/her supervisor, rather than sending or leaving a message.  (Tr. at 79–80; Def. Ex. L.)

### 4. Plaintiff's Advocacy for A.M. Regarding Her FMLA Rights

Plaintiff maintains that the adverse employment actions against her, starting with the two Written Supervisions in late January 2009, were taken in retaliation for Plaintiff's advocacy for A.M.'s rights under the FMLA.  The timing of Plaintiff's and AHRC Nassau's discovery about A.M.'s pregnancy is therefore relevant to this claim.

Plaintiff recalls that she learned that her client, A.M., was pregnant in January 2009.  (Tr. at 25, 46.)  Her recollection of the timing is based largely on an email dated February 4, 2009 that she sent to her supervisors about a therapy appointment for A.M. the day before.  According to Plaintiff, the need for A.M.'s therapy was prompted by her pregnancy, and Plaintiff's reference in the email to it being impractical and unsafe for A.M. to walk to the therapist's office from the train station "in her condition" was a reference to A.M.'s pregnancy.  (Tr. at 49–50; Pl. Ex. 59.)[13]

---

[12] "Call-out" refers to AHRC Nassau staff members being absent from, or arriving late to, work.  (Def. Ex. L.)

[13] The defense cross-examined Plaintiff about her deposition testimony, in which she testified that AHRC Nassau did not know learn of A.M.'s pregnancy until A.M. was five-months pregnant, which would have been in March 2009.  (Tr. at 44–46.)  Plaintiff later changed her

However, two Consumer Monthly Progress Reports ("Monthly Reports") prepared by Plaintiff relating to A.M. indicate that AHRC Nassau did not learn of A.M.'s pregnancy until February 2009. (Tr. at 349–55; Def. Ex. KK.) The first report was for January 2009 ("January Monthly Report") and was completed on February 2, 2009, and the second report was for the month of February 2009 ("February Monthly Report"), and was completed on March 2, 2009. *Id.* In the January Monthly Report, there is no mention of A.M.'s pregnancy. (Tr. at 354–55; Def. Ex. KK at 1–2.) But, in the February Monthly Report, Plaintiff wrote, "*This month* [the Supported Employment Program] found out that [A.M.] is pregnant." (Tr. at 355; Def. Ex. KK at 3) (emphasis added).

In addition, an email sent by Plaintiff to Linder and Murgola on March 13, 2009, Plaintiff stated that when visiting A.M. "last evening, I found out that she is due in August." (Def. Ex. Y.) Based on her recollection of receiving this email in March 2009, Linder believes that she learned about A.M.'s pregnancy in February 2009. (Tr. at 795–96.)[14]

The Court finds that AHRC Nassau learned of A.M.'s pregnancy in February 2009, even if Plaintiff learned this fact earlier. Although the February 4, 2009 email (Pl. Ex. 59) provides some support for the conclusion that Plaintiff and her supervisors learned of A.M.'s pregnancy in January,[15] this conclusion is directly contradicted by Plaintiff's own Monthly Reports, which explicitly state that AHRC Nassau learned of A.M.'s pregnancy in February. Furthermore, the reference to A.M.'s condition in the February 4, 2009 email does not preclude the possibility that

---

answer to three months in the errata sheets, after reviewing the February 4, 2009 email, which then placed the discovery in January 2009. (Tr. at 44–50.)

[14] Although Murgola similarly believes that AHRC Nassau learned about A.M.'s pregnancy in February, she has no independent recollection of the timing. Her memory is based on the documents she viewed during this litigation. (Tr. at 274, 356–57.)

[15] In reaching this conclusion, the Court does not discredit Plaintiff's recollection that she learned of A.M.'s pregnancy in January. Given that the difference in timing could be a matter of days and given the passage of time since the events in question, Plaintiff could easily be mistaken.

Plaintiff and AHRC Nassau learned of A.M.'s pregnancy in February, since that discovery could have occurred within the first few days of the month.[16] Thus, the Court concludes that AHRC did not become aware of A.M.'s pregnancy until *after* the issuance of the two Written Supervisions to Plaintiff in late January 2009.

5.  *June 2009: Counseling Memorandum Regarding Documentation*

On April 10, 2009, Murgola met with the ETSs, including Plaintiff, to discuss the importance of proper and timely documentation of the services that they provide to clients, as set forth in AHRC Nassau's policies. The ETSs were informed about the requirement that they document their services within 24 hours and that exceptions had to be approved by the Program Administrator. (Tr. at 78–80; JPTO at 4; Def. Ex. H.)

On June 10, 2009, Plaintiff delivered a service to a client, but did not complete the documentation until June 12, 2009. (Pl. Ex. 28.) Plaintiff self-reported her failure to timely prepare the documentation, explaining that there was no folder on the network for the client. *Id*. Plaintiff back-dated the documentation to June 10, 2009. (Tr. at 173, 262.)

On June 15, 2009, a Counseling Memorandum was issued to Plaintiff for the untimely documentation of services. (Pl. Ex. 28; JPTO at 4.) The memorandum recounted the meeting between Murgola and Plaintiff to discuss the documentation issue, and also explained that, in addition to the untimely documentation, Plaintiff failed to notify her supervisor within the required timeframe of the late submission. (Pl. Ex. 28.) The memorandum further advised Plaintiff that immediate improvement was expected. *Id*.

---

[16] The March 2009 email is inconclusive on the issue of when AHRC Nassau learned of A.M.'s pregnancy, since it only establishes that as of March 2009 AHRC Nassau knew A.M. was pregnant (though not her due date), but it does not indicate how long AHRC Nassau had been aware of that fact.

In June 2009, Plaintiff also received two "You Make the Difference" awards, the first for her "willingness to help when needed" and the second in recognition for going "above and beyond her employment responsibilities" to help a client. (Pl.'s Ex. 47; Tr. at 839–40.) The second award noted that Plaintiff "set a wonderful example of what matters the most." *Id.*

### 6. *August 2009*: *Plaintiff's Third Written Supervision*

On August 7, 2009, Plaintiff received a third Written Supervision ("Third Supervision"), which was based on Plaintiff's self-reported failure to document services that had been provided two weeks before. (Tr. at 82–85; Pl. Ex. 30; JPTO at 4.)[17] The Third Supervision noted that Plaintiff had been counseled about the failure to timely document services in June 2009. (Tr. at 81–83; Pl. Ex. 30.) Plaintiff's reason for not completing the paperwork the second time was that she forgot. (Tr. at 81–83.) Plaintiff was given a laptop thereafter to assist her in completing her documentation on time. (Tr. at 250; Pl. Ex. 30.)

### 7. *August 2009: Meeting with Maynard*

Maynard met with Plaintiff on or about August 12, 2009, following Plaintiff's receipt of the Third Written Supervision, to see if there was anything Plaintiff needed to help her in her job. (Tr. at 476, 506; Pl. Ex. 29) (Maynard stating in her File Note: "I felt it necessary to personally meet with Susan to discuss concerns and hear from her what if anything she may need to be successful."). At trial, Maynard testified: "I wanted to see how the plaintiff, how Susan was feeling. I wanted to know what was going on. I wanted to extend what—what would you need, is there anything that you need to help you in your position. I was concerned that there were

---

[17] Plaintiff was aware that had she not self-reported the untimely documentation the second time, it might never have been discovered or it could have been discovered much later by management. (Tr. 86.)

issues . . . . I really wanted to speak with Susan personally and see what, if anything, she might need." (Tr. at 506.)

During the meeting, Maynard told Plaintiff, among other things, that "it was the desire of the agency to retain her due to her skills and to do everything possible to assist her to be as successful as possible." (Pl. Ex. 29.) Plaintiff told Maynard that she "appreciated this news," but also expressed her concerns and frustrations, including, among others, that she had wanted to better her position, but felt it was no longer possible given the Written Supervisions she had received. *Id.*[18] She also felt that she was not receiving feedback on her ideas. *Id.* Maynard told Plaintiff that she (Maynard) was aware of many of Plaintiff's ideas, and cited two examples that Maynard told Plaintiff were "wonderful, but would take time and research and would need to be looked into." *Id.* In response to Plaintiff's concern about receiving conflicting information from her supervisors, Maynard told Plaintiff that she should feel free to ask questions and raise concerns without fear of retribution. *Id.*

C.    AHRC Nassau's Emphasis on Communication Between Supervisors
       and ETS staff

Because much of an ETS's work involves off-site meetings and responsibilities, it was of paramount importance that an ETS communicate with his/her supervisor. (Tr. at 53–54, 231–33, 298–299, 364, 814.) Failing to communicate one's whereabouts to a supervisor was "almost the worst thing an ETS [could] do." (Tr. at 814.) The ETSs also were responsible for ensuring that their supervisors know their whereabouts and that they were reachable throughout the workday. (Tr. 53, 803–04.) Communication between an ETS and his/her supervisor is accomplished through the Outlook calendar and/or direct communication with the supervisor. (Tr. 53, 232–34,

---

[18] Under AHRC Nassau's policies, a staff person cannot be promoted if he/she has three Written Supervisions. (Dkt. 65 at 1.)

803–04.)  The Outlook calendar, which AHRC Nassau began using in 2008, was a tool that supported the ability of supervisors to communicate with ETSs and know where they were.  (Tr. at 804, 232–234.)  Supervisors, with permission, had access to the ETSs' individual Outlook calendars, and Simons specifically had access to Plaintiff's.  (Tr. at 720.)  ETSs were required to notify their supervisors of any change in their schedule that was not reflected in the ETS's Outlook calendar.  (Tr. at 58, 234.)  ETSs who were less adept at using the Outlook calendar could advise their supervisors by direct communication about changes in their schedules.  (Tr. at 201–202, 809.) Although no ETS received a Written Supervision solely for failing to update his/her Outlook calendar, failure to maintain the calendar was a performance factor that could contribute to an ETS receiving a Written Supervision.  (Tr. at 74, 240, 260–62, 722.)

When Murgola was first employed as an ETS, all ETSs were given pagers so that their supervisors could contact them in the field.  (Tr. at 231–33.)  Later, as more ETSs had their own cellphones, cellphones were substituted for pagers as a means of communication between ETSs and their supervisors.  *Id*.  During the time that Plaintiff worked at AHRC Nassau, ETSs were expected to have their cellphones with them at all times, in case they needed to be reached in the field.  (Tr. at 54.)[19]  However, AHRC Nassau did not pay for or contribute to the ETSs' use of their personal cellphones for work.  (Pl. Ex. FF. ¶ 4.)  ETSs were not given any document to sign regarding the use of their personal cellphones for work.  (Pl. Ex. C. ¶ 3.)  While an ETS who did not have a cellphone could request one from AHRC Nassau to use in the field, AHRC Nassau generally did not notify staff that an office cellphone was available; an ETS had to raise the issue with his/her supervisor in order to get such a phone.  (Tr. at 231–33, 337–38.)

---

[19] Although Plaintiff may be correct that the SEP unit did not have a policy requiring ETSs to have their personal cellphones with them at all times (Pl. FF. ¶ 1), the evidence indicates that ETSs were required to carry a cellphone, whether theirs or the agency's, with them during work hours.  (Tr. at 54.)

D.    Plaintiff's Termination from AHRC Nassau: November 2009

On November 3, 2009, at approximately 2:50 p.m., Simons, who replaced Linder as Plaintiff's supervisor in August 2009, called Plaintiff on her cellphone because A.M. had come to AHRC Nassau looking for Plaintiff.  (JPTO at 5.)  A.M. told Simons that she (A.M.) had an appointment with Plaintiff that afternoon.  (Tr. at 582–83.)[20]  Plaintiff's Outlook calendar did not indicate Plaintiff's whereabouts from 3:00 to 4:00 that afternoon.  (JPTO at 5.)  Plaintiff had forgotten to indicate on her calendar that she had an appointment at 3:00 p.m. at Dress Barn, where one of her clients worked.  (Tr. at 91.)  In her message, Simons told Plaintiff that A.M. was looking for Plaintiff and that Plaintiff should call Simons.  (Tr. at 95-96.)  By the time Plaintiff received Simons's voicemail message it was approximately 4:00 p.m., the typical end of the business day for AHRC Nassau.[21]  Even though Plaintiff had Simons's cell phone number, she did not return Simons's call because she (Plaintiff) did not think the matter was pressing and she did not want to be yelled at by Simons.  (JPTO at 5; Tr. 91–93, 96–97.)  Plaintiff also felt that she should not have to use her personal phone "after hours."  (Tr. at 96–97.)[22]

Simons felt that, based on the content of Simons's message, Plaintiff should have realized that the call was urgent and should have called back.  (Tr. at 737.)  All ETSs had Simons's cell phone number.  (Tr. at 712–13.)  Simons expected Plaintiff to call her cell if she (Plaintiff) called after 4:00 p.m.  *Id.*  Other ETSs routinely called Simons's cell. (Tr. at 715.)  Simons always

---

[20] Simons testified at trial that, notwithstanding her disability, A.M. was very reliable about her schedule.  (Tr. at 582–84.)  Plaintiff, however, testified that she did not have an appointment with A.M. that day.  (Tr. at 97–98.)

[21] Plaintiff did not bring her cellphone into Dress Barn because she did not want security going through her pocketbook, and she saw no reason to leave her pocketbook in the car and just bring her cellphone.  (Tr. at 91–92.)

[22] Plaintiff suggests that she did not return Simons's call on November 3 because she "believed in good faith that Simons did not want to be called 'after hours'[.]"  (Pl. Ex. C. ¶ 54.)  The Court, however, finds that this statement is not supported by Plaintiff's testimony at trial.  (*E.g.*, Tr. at 96–97.)

received return calls from ETSs within an hour. (Tr. at 724–25.) No ETS had ever failed to return a call from Simons the same day. *Id.* Simons believed that any other ETS besides Plaintiff would have called Simons back if the ETS received a message from her about one of their clients thinking he/she had a meeting with the ETS. (Tr. at 606).

Plaintiff did not return Simons's phone call the next morning. (Tr. at 94; JPTO at 5.) Simons did not call Plaintiff again that morning because Plaintiff had not returned Simons's previous call, and Simons did not know whether Plaintiff's cell phone was working. (Tr. at 619–21.) Instead, Simons called the Baldwin Library, which was where Plaintiff's first appointment was that morning. *Id.*

Plaintiff was scheduled to be at the Baldwin Library from 9:00–10:30 a.m. to meet with her client, D.M. (Tr. at 95, 623; JPTO at 5.) Plaintiff was late for her appointment at the Baldwin Library. (Tr. at 95.)[23] Plaintiff did not call anyone to say that she was running late. (Tr. at 98.) She does not recall why she was late that morning. (Tr. at 95.)

Simons called the Baldwin Library at approximately 10:30 or 10:40 a.m., and spoke to D.M. (Tr. at 619, 624.) D.M. reported that Plaintiff had arrived at the library at 10:00 a.m. and left at 10:10 a.m.[24] Plaintiff later acknowledged to Simons that she (Plaintiff) had gotten to the library at 10:00 a.m. after having left her house at 9:00 a.m. (Tr. 627; Def. Ex. FF.) Plaintiff recalls arriving at AHRC Nassau at approximately 10:15 or 10:20 a.m. that morning. (Tr. at 99.)

Later that day, Simons engaged Plaintiff in a "support meeting." (Def. Ex. FF at 2.)

---

[23] Plaintiff states that she arrived at the Baldwin Library at 9:15 a.m. and remained there for an hour. (Tr. at 95; Pl. FF. ¶ 13.) These statements, however, are contradicted by Plaintiff's statement to Simons that day, in which Plaintiff confirmed that she arrived at the library at 10:00 a.m. (Tr. 627; Def. Ex. FF.)

[24] Although D.M.'s short-term memory was very limited, Simons trusted the accuracy of D.M.'s account because D.M. tended to write down things she wanted to remember in her notebook. (Tr. at 623.)

Simons memorialized the meeting in a file note.  *Id.*  Plaintiff does not recall what she and Simons discussed at the meeting.  (Tr. at 100.)  Regarding November 3, Simons asked Plaintiff where she was between 3:00 and 4:00 p.m. that day, and Plaintiff responded that she had visited another client after her 2:00–3:00 p.m. appointment, even though Plaintiff's calendar did not list an appointment after 3:00 p.m.  (Def. Ex. FF at 1.)  When asked why she had not called Simons to advise her of the change in schedule, Plaintiff gave no response.  *Id.*  Simons explained that all ETSs were required to call their supervisors about changes in their schedules.  *Id.*  Simons told Plaintiff that her Outlook calendar had to accurately reflect her entire workday and reminded Plaintiff that this issue had been discussed with her on previous occasions.  (Def. Ex. FF at 1–2.)  Simons also offered Plaintiff assistance in completing this task, but Plaintiff declined.  (Def. Ex. FF at 2.)

In addition, Simons discussed with Plaintiff that "her efforts for completing paperwork . . . left much to be desired as she [was] not trying to seek out correct information pertaining to some of the individuals on her caseload."  *Id.*[25]  Simons reviewed all of the corrections needed for her paperwork and directed Plaintiff to immediately make the changes.  *Id.*

Although Plaintiff apologized regarding the issues with her schedule,[26] Simons did not feel that Plaintiff's apology was sincere, genuine, or meaningful.  (Tr. at 749–51.)  Simons did not perceive that Plaintiff was contrite or remorseful because her "affect wasn't necessarily congruent with the apology."  (Tr. at 750.)  Simons described the apology as "It was just, 'I am

---

[25] During the two months she supervised Plaintiff, Simons discussed various performance issues with Plaintiff, including documentation.  (Tr. at 611–12; Def. Ex. GG, HH, and II.)  For example, in late October 2009, Simons spoke to Plaintiff about her habilitation plans frequently being incomplete, an issue that had been discussed repeatedly with Plaintiff during weekly support meetings.  (Def. Ex. GG.)

[26] Simon's file note indicated that Plaintiff acknowledged that everything discussed  during the meeting should have been done correctly and would be fixed, and that she (Plaintiff) was accountable for her part in the issues raised during the meeting.  (Def. Ex. FF.)

sorry.'  Very brief and with a lack of remorse."  *Id.*  When Simons was later asked by Maynard and Murgola about Plaintiff's reaction during the support meeting, Simons reported that Plaintiff was not remorseful and that her apology was insincere.  (Tr. at 751.)

Although Simons only supervised Plaintiff for two months, Plaintiff was Simons's most problematic employee during the time Simons worked at AHRC Nassau.  (Tr. at 610–11, 752–53.)  Simons had many issues with Plaintiff's work performance during that time, including Plaintiff representing that time-off had been approved by her prior supervisor when it had not, repeatedly submitting incomplete paperwork, failing to account for her time, and failing to correct issues that were presented to her.  (Tr. at 610–11, 752–53.)  Simons's main issues with Plaintiff's performance were not being able to reach Plaintiff or knowing where she was, and her failure to correct problems after they were addressed with her.  (Tr. at 682–683, 764.)[27]  Simons noted that Plaintiff was defensive and did not accept constructive criticism.  (Tr. at 764.)

At the same time, Simons did not want Plaintiff, or anyone else, to be fired.  Simons credibly testified at trial, "I want success for people that I supervised.  I want to keep someone from being fired.  I mean, I don't know.  I wouldn't want anybody to get fired."  (Tr. at 610.)  Simons was unaware that Plaintiff might be terminated following the events of November 3 and 4, and was not consulted regarding the termination decision.  (Tr. at 293, 587.)

At trial, Plaintiff attempted to demonstrate that Simons was biased against Plaintiff based on an incident in which Plaintiff failed to follow the chain of command by emailing Simons's superiors, Murgola and Maynard, about a suggestion relating to A.M.'s work schedule.  (Pl. Exs. 35 and 36.)  However, the Court does not find any evidence that Simons was biased against Plaintiff based on this, or any other, incident.  Simons credibly testified that she was "frustrated"

---

[27] Simons, however, did not characterize the issue of determining Plaintiff's whereabouts as chronic.  (Tr. at 610.)

about Plaintiff not speaking to Simons before sending the email, but did not harbor ill feelings toward Plaintiff over the email, and that none of Simons's decisions regarding Plaintiff were influenced by this incident. (Tr. at 848–50.) In fact, Simons could have given Plaintiff a Counseling Memorandum for her incomplete habilitation plans, but chose not to do so. (Tr. at 726; Def. Ex. GG.)

On November 4, 2009, after meeting with Simons, Murgola recommended to Maynard that Plaintiff be terminated. (Tr. at 289–93, 508.) Murgola's recommendation was based largely on Plaintiff's failure to communicate with Simons regarding her whereabouts on November 3 and 4, and the fact that the communication issue appeared to be the "same thing that was happening again and again." (Tr. at 292, 519; Def. Ex. FF.[28]) Murgola felt that the two incidents on November 3 and 4 alone were "significant enough" to warrant termination. *Id.*

Murgola identified the factors that went into the decision to terminate Plaintiff's employment with AHRC Nassau:

> We looked at the number of instances where things were addressed, the work performance issues, the inability to understand [Plaintiff's] whereabouts, the lack of communication. Looking at all those write-ups and we had three written supervisions on file. We had had discussions and documentation prior to those supervisions being issued, and it was kind of, where do we go from here? What more is there to do?

(Tr. at 367.) Murgola explained that the "lack of acknowledgement of responsibility" by Plaintiff factored into the decision because her supervisors "really didn't see a true effort to make improvement." (Tr. at 367–68.)

Maynard described the reasons behind the termination decision this way:

> We couldn't account for where Susan was. That was a recurring issue[]. . . . And we had . . . discussed with her on many occasions the importance of

---

[28] The transcript incorrectly identifies this exhibit as Defense Exhibit "F," instead of "FF." (Tr. at 292.)

communicating her whereabouts through support memos, support meetings. Obviously, counseling memos, written supervisions. And it was just a – there seemed to be no – there seemed to be no change in that. In that, it was, you know, not going to change. And that's such an important part of what we do.

(Tr. at 519.) Maynard also indicated that concern about Plaintiff's documentation of services was another factor, but it was not a driving force behind the termination decision. (Tr. at 520.)

Murgola and Maynard discussed whether a disciplinary action short of termination, such as another Written Supervision, was appropriate. (Tr. at 368–69.) Maynard did not believe that another Written Supervision would have done any good, but wanted to check with Diane Rodriguez in AHRC Nassau's Human Resources Unit "to be absolutely sure." (Tr. at 508.)

Maynard prepared a memorandum ("Termination Memorandum") for Rodriguez setting forth the bases for Maynard's recommendation to terminate Plaintiff's employment. (Tr. at 521; Pl. Ex. 32.) The Termination Memorandum provided a chronology of Plaintiff's performance issues, as reflected in file notes, Counseling Memoranda, and Written Supervisions. (Pl. Ex. 32.)[29] The underlying documents also were provided to Rodriguez. (Tr. at 532–33, 434–35.) The Termination Memorandum also provided a detailed description of the events of November 3 and 4, 2009, emphasizing Plaintiff's failure to account for her whereabouts and time on both

---

[29] At trial, Maynard acknowledged that her memorandum erroneously stated that Plaintiff had violated State and federal regulations relating to Plaintiff's failure to contemporaneously document services provided in June and August 2009. (Tr. at 504–05, 523–24, 528–29.) Maynard clarified, however, that her mistake was stating that Plaintiff had violated the actual regulations when Plaintiff had instead violated AHRC Nassau's policy that was intended to *prevent* the violation of the State and federal regulations. (Tr. at 523–24.) Furthermore, the fact that Plaintiff did not violate these regulations would have not changed Maynard's decision to terminate Plaintiff because she had still violated AHRC Nassau policy by failing to timely document a service. (Tr. at 528.) In reviewing the Termination Memorandum, Rodriguez correctly interpreted Maynard's memorandum to refer to Plaintiff's failure to timely document services that she provided to a client. (Tr. at 416–18, 544–45.) Rodriguez did not give as much weight to the documentation lapses as she did the communication issues because of the longstanding nature of the latter. (Tr. at 545.)

days.  *Id.*[30]  Maynard's Termination Memorandum contained no personal information about Plaintiff, and did not identify Plaintiff's race.  *Id.*  It concluded with this statement by Maynard:

> It is unfortunate that [Plaintiff] is unable to perform the duties of an Employment Training Specialist as specified.  Various supervisors and administrators have met with her and attempted in every way imaginable to help her be successful and in turn help our individuals in Supported Employment achieve their desired level of success.

*Id.*

In her cover email to Rodriguez transmitting the Termination Memorandum, Maynard asked Rodriguez to advise Maynard "whether we have sufficient documentation to justify termination or whether you feel a FINAL written supervision is warranted."  (Pl. Ex. 32 at 1.)  Rodriguez agreed with, and approved, the decision to fire Plaintiff.  (Tr. at 405, 428–29.)  In making this decision, Rodriguez considered the Plaintiff's failures to account for her time and communicate with her supervisors to be the most significant issues.  (Tr. 418–19, 545.)  Based upon her experience in reviewing termination recommendations, she did not feel that another Written Supervision was appropriate.  (Tr. at 439–40.)  Rodriguez considered repetition of the same issue an important factor, especially if someone had been counseled about it, and remorse was another factor considered in disciplining an employee.  (Tr. at 235–37, 647–48.)

Rodriguez took approximately one hour and 15 minutes to reach her decision regarding Plaintiff's termination.  (Tr. at 387; Pl. Ex. 32.)  Rodriguez, who is not African-American, had never met Plaintiff, and did not know Plaintiff's race.  (Tr. at 430, 436.)

The following day, November 5, 2009, Plaintiff's employment at AHRC Nassau was terminated.  (Tr. at 103, 721.)

---

[30] Maynard conceded that her knowledge of Plaintiff's work performance was based solely on the reports of Plaintiff's direct supervisors, *e.g.*, Murgola and the other supervisors.  (Tr. at 529–30.)

E.     *Conduct of Other AHRC Nassau ETS Staff*

Other ETSs at AHRC Nassau were disciplined for and/or engaged in the following conduct:

1.     *JF[31]*

In March and April 2009, JF, a white male[32], was warned about his failure to properly maintain and update his Outlook calendar.  (Pl. Ex. 18 and 24.)  During a support meeting on March 23, 2009, JF was given a "Final Warning!" about the need to improve his calendaring. (Pl. Ex. 18 at 00637.)  Notes for the next week's support meeting, on March 30, 2009, document an "immediate improvement!!!" with respect JF's Outlook calendar.  (Pl. Ex. 18 at 00636.) During two other support meetings, on April 20, 2009 and April 27, 2009, JF was told that he needed to list his work hours at the top of each day in his Outlook calendar.  (Pl. Ex. 18 at 00333–4.)  JF's supervisors recognized that he had a difficult time using the Outlook calendar function.  (Tr. at 201–02, 597.)  Despite JF's issues with maintaining his Outlook calendar, his supervisors always could find or reach him.  (Tr. at 201–02, 538–39, 598–99, 693–94, 724.)[33]

---

[31] The Court refers to these other employees by their initials.

[32] Although no evidence or testimony was given regarding JF's race, the implication of the parties' arguments is that JF is white.  (*See*, *e.g.*, Pl. Closing Argument, Dkt. 101, at 5–7. 10, 12, 14, 18.)

[33] At trial, Plaintiff introduced excerpts from the Outlook calendars of several ETSs, including JF, for the purposes of demonstrating that these ETSs failed to properly maintain and update their calendars, as evidenced by blank spaces in their calendars.  (*E.g.,* Pl. Exs. 22–26.) However, the Court cannot draw this conclusion based solely on the calendar excerpts themselves.  First, AHRC Nassau supervisors often assumed that the absence of a calendar entry for a particular time slot indicated that the ETS was at the AHRC Nassau office.  (Tr. at 166, 596–97, 815.)  Second, ETSs were not required to list their vacations or days off in their Outlook calendars because it was assumed that their supervisors would be aware of those absences through other means.  (Tr. at 256–58.)  Thus, extended periods without any calendar entries could reflect an ETS's approved vacation time or long periods of time in the office without client visits.

In June 2009, JF received a Counseling Memorandum for over-use of his sick time. (Pl. Ex. 10.) JF eventually transferred to the position of Job Developer and later resigned from AHRC Nassau. (Tr. at 147–48.)

### 2. FG

On March 17, 2008, FG, a white male[34], received a Counseling Memorandum based on a second instance of his whereabouts being unknown. (Pl. Ex. 19.) On June 24, 2009, FG received a "FINAL NOTICE!!!" about failing to maintain and update his Outlook calendar. (Pl. Ex. 20.) Although FG had difficulty maintaining his Outlook calendar, there was no issue with his supervisors knowing his whereabouts because he communicated directly with them on a frequent basis. (Tr. at 160–62, 165.)

FG received the Counseling Memorandum in March 2008 because of two instances, in close succession, where Murgola could not find him at the office at the start of the day. (Tr. at 152–56.) After March 2008, there was never another instance when FG's supervisors did not know his whereabouts or could not reach him. (Tr. at 156–57, 240.) FG eventually was allowed to transfer to a part-time position in another department. (Tr. at 319–20.)

### 3. JZ

In August 2008, JZ, a white female (Tr. at 268), received a Counseling Memorandum for three issues that arose during the same week. (Pl. Ex. 15.) One issue related to incorrect billing documentation, although the memorandum noted that JZ subsequently "provided instrumental assistance in obtaining the correction information." *Id.* The second issue was that JZ did not

---

[34] There was no testimony or evidence adduced at trial with respect to FG's race. However, the implication of the parties' arguments is that FG is white. (*See*, *e.g.*, Pl. Closing Argument, Dkt. 101, at 5–7. 10, 12, 14, 18.)

make the two required visits in a month for two clients on her caseload, although the memorandum noted that immediate improvement had been made with respect to this issue after JZ's meeting with her supervisor. The third issue was JZ responding inappropriately to a client who was upset. *Id.*

In May 2009, JZ failed to obtain certain information for a medical list for one of JZ's clients. (Pl. Ex. 16.) Simons, her supervisor, spoke to her about the minimal effort that JZ had put into compiling the list. *Id.* JZ apologized and acknowledged doing a poor job. *Id.* JZ said that she would seek assistance from Simons in obtaining the missing information and that she would submit the missing documentation to Simons "asap." *Id.* Simons did not consider giving JZ a Written Supervision for the documentation lapse because it was not a "billable discrepancy,"[35] but had the lapse "directly impacted [AHRC Nassau's] billing, [its] ability to bill somebody . . . [she] would have." (Tr. at 642.)

In October 2009, JZ was given a Counseling Memorandum for inappropriately accessing Facebook or MySpace via AHRC Nassau's computers on two consecutive days that month. (Pl. Ex. 12.)[36] JZ was counseled that AHRC Nassau computers were "solely for business use." *Id.* A Counseling Memorandum, as opposed to a Written Supervision, was appropriate because the two instances happened in quick succession, and JZ was not advised after the first instance to cease this conduct. (Tr. at 487–88.) JZ is still employed as an ETS at AHRC Nassau. (Tr. at 335.)

---

[35] By contrast, the incorrect information that prompted the August 2008 Counseling Memorandum given to JZ was billing-related information. (Tr. at 639–42.)

[36] An ETS's use of the Internet for personal reasons was less serious than his/her failure to update the Outlook calendar and communicate with his/her supervisors regarding their whereabouts. (Tr. at 813.)

### 4. SM

In April 2009, SM, a white female,[37] missed her client's Individualized Service Plan ("ISP") meeting. (Pl. Ex. 14; Tr. 192.) Simons met with SM to determine why SM missed the meeting and to advise SM that it was necessary to attend all clients' ISP meetings. *Id.* SM apologized and said that she would not miss any more meetings. *Id.* Attendance at ISP meetings is not a billable event. (Tr. at 699.)

In June 2009, SM was counseled regarding her over-use of sick time. (Pl. Ex. 9.) SM was thereafter required to furnish medical documentation for future unexpected sick leave requests. *Id.* SM transferred to the position of a registered nurse at AHRC Nassau. (Tr. at 336.)[38]

### 5. JG

JG's Outlook calendar for September 2009 to November 2009 contains unaccounted-for time periods. (Pl. Ex. 22.) Maintaining his Outlook calendar was not JG's "strong suit." (Tr. at 330.) Despite JG's problems with maintaining his calendar, JG's supervisors always knew where he was. (Tr. at 201–02, 330, 815, 832.) JG was "phenomenal in his documentation," and currently trains new staff on AHRC Nassau's documentation standards. *Id.* JG, a white male[39], is still employed as an ETS at AHRC Nassau. (Tr. at 335.)

---

[37] Although there is no direct evidence or testimony with respect to SM's race, the implications of the arguments set forth by the parties is that she is white.

[38] Plaintiff introduced excerpts from SM's Outlook calendar to show that she had misused her flex time. (Pl. Ex. 13.) However, the Court cannot make that determination based on the evidence introduced at trial. (Tr. at 666–81.)

[39] Although there is no direct evidence or testimony with respect to JG's race, the implications of the arguments set forth by the parties is that she is white. (*See*, *e.g.*, Pl. Closing Argument, Dkt. 101, at 5-7. 10, 12, 14, 18.)

### 6. JM

In April 2009, AHRC Nassau received a complaint that JM, a white male, was not meeting sufficiently with the management at the business where his client was working. (Pl. Ex. 17; Tr. at 254.) JM did not receive any discipline in connection with this complaint. *Id.*

In July 2009, JM was issued a Written Supervision for falsely stating that documentation for a client's billing review was complete, when, in fact, several significant documents were missing. (Pl. Ex. 31, Tr. at 252.) A Written Supervision, as opposed to a Counseling Memorandum, was given because of the severity of the conduct, *i.e.* that it involved a false statement about having reviewed a checklist when he had not. (Tr. at 796–98, 217–22.) JM was the only other ETS besides Plaintiff to receive a Written Supervision during the time that Plaintiff worked there. (Tr. at 215.) JM initially was denied a promotion to supervisor because of his Written Supervision. (Tr. at 216; JPTO at 5.) He subsequently was promoted to a supervisory position in the SEP unit. (Tr. at 216, 229.)[40]

Plaintiff often observed JM arriving to work between 9:45 and 10:00 a.m., even though the starting time is 9:00 a.m. for ETSs. (Tr. at 320; Plaintiff's Findings of Fact ("Pl. FF.") ¶ 43; Tr. at 166, 254.) JM was very good at maintaining his Outlook calendar. (Tr. at 162.)

### 7. BM

BM, a white female, had issues with failing to communicate and received one or two Written Supervisions for this conduct and possibly other reasons. (Tr. at 369–72.) BM resigned in January 2013. (Tr. at 370–72.)

---

[40] Under AHRC Nassau's policies, an employee cannot be promoted for one year after receiving one Written Supervision. (Tr. at 89, 255, 841–42.)

8.      *MD*

In July 2011, MD received a Written Supervision for failing to report physical abuse of a client that MD observed.  (Pl. Ex. 40.)  It appears that MD was not terminated for failing to report the abuse.  (Tr. at 543.)

9.      *Linder*

In February 2004, when Linder was an ETS, she was issued a Written Supervision for failing to maintain appropriate boundaries.  (Def. Ex. S.)  Linder received the Written Supervision because she cried upon learning that her client was being fired from his job.  (Tr. at 840–41.)  Linder had not received a Counseling Memorandum for this type of conduct prior to receiving the Written Supervision.  (Tr. at 841.)  As a result of the Written Supervision, Linder could not be promoted for at least one year.  *Id*.

10.     *BW*

Murgola experienced work performance issues with BW, a white female ETS, that were similar to those of Plaintiff, specifically that:

> her whereabouts were unknown.  There were major discrepancies in the timing that she indicated she delivered a visit and the documentation of it, based on my conversations with the individual directly as to when she – the individual told me [BW] had been there to see here versus when [BW] had told me she had been there to see her.  [BW's] Outlook calendar hours did not reflect the individual's work hours.

(Tr. at 370.)  BW received Written Supervisions in response to those work problems.  (Tr. 370–71.)  Murgola would have recommended termination if BW had engaged in the same conduct again.  (Tr. at 371.)  BW later resigned with less than a day's notice.  (Tr. at 370.)

F.     Treatment of Other African-American ETSs at AHRC Nassau

During her time at AHRC Nassau, Simons supervised six African-American employees. (Tr. at 744.)  Simons did not discipline these employees more harshly than their Caucasian counterparts.  For example, SB, an African-American ETS, had significant employment issues. (Tr. at 745–46.)  Yet, Simons chose to address those issues via notes to file, rather than giving SB a Counseling Memoranda or Written Supervisions.  (Tr. at 746.)

Murgola likewise treated SB favorably.  Following SB's probationary period at the beginning of her employment with AHRC Nassau, Murgola determined that SB could have been terminated due to performance issues.  (Tr. 239–40.)  However, Murgola recommended that SB's probationary period be extended to give SB "a chance to prove herself."  (Tr. 239–40, 758–59.)  SB's probationary period was extended (Tr. 758), and SB ultimately was hired permanently.  (*See* Tr. 744–45.)

SB and another African-American employee, DM, both were supervised by the same supervisors as Plaintiff, but they did not receive any Written Supervisions.  (JPTO at 5; Tr. at 746.)

As an ETS from 2000 to 2004, Murgola worked with an African-American ETS, KD. (Tr. at 121.)  After Murgola later became a supervisor, she promoted KD to the position of assistant supervisor in 2006.  (Tr. 121, 123.)  KD succeeded in the new position, and contributed to the AHRC Nassau's brochure for the SEP division.  (Tr. 123; Pl. Ex. 58.)

Lastly, of the approximately eight ETSs currently in the SEP, one is African-American. (Tr. at 336.)  There is no evidence that this employee has received any Written Supervisions or other discipline, or that this employee has been treated any differently than the Caucasian ETSs.

**II.     Conclusions of Law**

A.     <u>Plaintiff's Title VII Claim</u>

Title VII, 42 U.S.C. § 2000e, *et seq*., provides redress for employees whose employers unlawfully discriminate against them in the work place based on a protected characteristic, namely, race, color, religion, sex, or national origin.  Plaintiff's claim is specifically based on Title VII's provision that:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

*1.     Burden-Shifting*

The disposition of an employment discrimination action follows the three-step burden-shifting procedure established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–805 (1973), as further elaborated and explained in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 505–12 (1993), and as applied by the Second Circuit in *James v. N.Y. Racing Assocs.*, 233 F.3d 149, 153–54 (2d Cir. 2000).  First, the plaintiff must establish a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  Second, if the plaintiff succeeds in demonstrating a *prima facie* case, there is established a rebuttable presumption of discrimination, which the employer may rebut by articulating a legitimate, non-discriminatory reason for the adverse employment action.  *Id.*  Lastly, if the employer provides such a reason, the presumption of discrimination "simply drops out of the picture," *St. Mary's Honor Ctr.*, 509 U.S. at 511 (1993), and the plaintiff must show that it is more likely than not that the employer intentionally discriminated against the plaintiff.  *Id.* at 519.  In making this showing, the plaintiff may "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not

its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981).

While the *McDonnell Douglas* framework is helpful in analyzing Title VII discrimination claims, its procedure "is not a rigid ritual, but simply an orderly way to evaluate proof when discrimination is claimed." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988). Accordingly, the Court's ultimate task as the finder of fact, notwithstanding *McDonnell Douglas*'s burden shifting, is determining "discrimination *vel non*," *i.e.,* whether plaintiff has proven by a preponderance of the evidence that the defendant discriminated against her. *See Reeves v. Sanderson Plumbing Prods.*, *Inc.*, 530 U.S. 133, 143 (2000) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713 (1983)).

### 2. Prima Facie Case

To establish a *prima facie* case of racial discrimination, Plaintiff "must show that: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008). Plaintiff's burden at this stage is one of production, not persuasion, and accordingly involves no credibility assessments. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000).

The Court finds that Plaintiff has established a *prima facie* case of racial discrimination. As to the first three elements of the test, there is no dispute. First, Plaintiff, an African-American female, belongs to a protected class. Second, Plaintiff generally was qualified for the position of ETS-1. Third, termination clearly constitutes an adverse employment action.

Regarding the fourth element, the Court finds that the evidence introduced in this case is sufficient to establish that Plaintiff's termination "occurred under circumstances giving rise to an inference of discriminatory intent." *Brown*, 673 F.3d at 150. Most probative to this determination are the facts that Plaintiff was disciplined more severely for conduct similar to conduct engaged in by other, white ETSs and that Plaintiff is the only ETS who has been terminated by AHRC Nassau since approximately 2008. (*See supra* at I.E; Tr. at 369; *see also* Dkt. 42 (order on AHRC Nassau's motion for summary judgment).)

### 3. *Nondiscriminatory Justification*

When a plaintiff sets forth a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's firing. *Hicks*, 509 U.S. at 506–07. AHRC Nassau's stated reason for terminating Plaintiff's employment was her failure to comply with AHRC Nassau's workplace policies, by, among things, not keeping her supervisors apprised of her whereabouts, not communicating with supervisors about changes in her schedule, failing to update her Outlook calendar, and multiple instances of untimely and incomplete documentation. (Pl. Ex. 32; Tr. at 367–68, 519–20.)

The Court finds that AHRC Nassau's stated reason for Plaintiff's termination is legitimate and non-discriminatory. "Poor work performance has often been recognized as a legitimate, non-discriminatory reason for termination." *Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F. Supp. 2d 659, 666 (S.D.N.Y. 2009).

### 4. *Pretext/Discrimination*

If the defendant provides a legitimate, non-discriminatory reason for the adverse employment action, the presumption of discrimination "simply drops out of the picture," *St. Mary's Honor Ctr.*, 509 U.S. at 511 (1993), and the plaintiff must show that it is more likely than

not that the employer's actions were motivated by discrimination. *Id.* at 519. To meet this burden, the plaintiff may "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs*, 450 U.S. at 252–53; *see Tomassi v. Insignia Fin. Grp, Inc.*, 478 F.3d 111, 114 (2d Cir. 2007) (plaintiff bears the burden to present evidence tending to show that the defendant's stated reasons are pretext for discrimination). Again, the Court's ultimate task is to determine "discrimination vel non," *i.e.*, whether plaintiff has proven by a preponderance of the evidence that the defendant discriminated against her. *See Reeves*, 530 U.S. at 143 (2000).

### 5. Race Was Not a Factor in AHRC Nassau's Discipline and Termination of Plaintiff

The Court finds that Plaintiff has failed to demonstrate, by a preponderance, that race was a factor in AHRC Nassau's disciplinary decisions with respect to her.

### a. Direct Evidence

Three of Plaintiff's supervisors—Maynard, Murgola and Linder—credibly testified that Plaintiff's race played no role in the decisions they made with respect to the disciplinary actions taken against Plaintiff. (Tr. at 294, 511, 845.) Murgola and Linder also credibly testified that they never discussed Plaintiff's race with anyone at AHRC Nassau. (Tr. at 294, 845.) Although Simons was not specifically asked the race question, the Court finds, based on its observations of Simons at trial and her overall testimony, that Simons' decisions with respect to Plaintiff were not affected, in any way, by Plaintiff's race. In addition, Rodriguez, who approved the termination, had never met Plaintiff, and did not know Plaintiff's race, when she appeared the termination decision. (Tr. at 430, 436.)

The conclusion that the disciplinary actions taken against Plaintiff were not based on race is further supported by the documentary evidence, including the Notes to File, Counseling

Memoranda, and Written Supervisions. In particular, Plaintiff's failure to keep her supervisors apprised of her whereabouts and her unwillingness and/or inability to improve in this area were significant factors in the termination decision and were frequently brought up with Plaintiff during her employment. Further, it is worth noting that there is no dispute that the incidents underlying the disciplinary actions occurred. Rather, Plaintiff argues that the discipline she received in response to those incidents was disproportionate and discriminatory compared to what the white ETSs received for the same conduct.

<em>b. Circumstantial Evidence Regarding Allegedly<br>Disproportionate and Discriminatory Discipline</em>

Plaintiff contends that she was disciplined more severely than white ETSs who engaged in the same conduct. The evidence, however, does not support this conclusion.

As an initial matter, it is difficult to compare the Plaintiff's conduct with most of the conduct of the white ETSs because they are not directly equivalent. For example, Plaintiff cites instances of two ESTs, SM and JF, over-using sick time, for which they received Counseling Memoranda. (Pl. Exs. 9, 10.) There is no way to know how this conduct compares with any of Plaintiff's conduct. Similarly, it is difficult to know how to compare JZ's failure to conduct the required number of client visits for two clients or her inappropriate response to a client with Plaintiff's conduct.

To the extent that Plaintiff's and the white ETSs' conduct is comparable, *e.g.*, the failure to maintain and update the Outlook calendar, Plaintiff's conduct is distinguishable on the basis that (1) Plaintiff repeatedly engaged in the same conduct after being counseled by her supervisors about the issue; and (2) Plaintiff did not appear to take these issues seriously and did not evince an attitude of wanting to change or correct these issues. It was the repetitive nature of Plaintiff's performance issues that set her apart from the other ETSs. No other ETS who

received a Counseling Memorandum for a particular type of conduct engaged in that conduct again.  (Tr. at 251, 268–69.)  No other ETS received three Written Supervisions and then engaged in the same conduct that gave rise to the Written Supervisions, nor did so within such a short period of time as Plaintiff.  (Tr. at 386.)

Furthermore, the area in which Plaintiff had the most lapses, namely, failing to communicate with her supervisors about her whereabouts, was an area of particular importance to the SEP unit and one with which the other ETSs did not have the same degree of non-compliance.  For example, Simons was able to locate and contact the employees she supervised, except Plaintiff.  (Tr. at 604–05.)  ETSs, other than Plaintiff, called their supervisors to notify them that they would be late for appointments outside the office.  (Tr. at 294, 655, 722–23.)

Finally, Plaintiff was not the only ETS who was severely disciplined.  JM, for example, received a Written Supervision, without a prior Counseling Memorandum, for submitting a false statement about the completeness of materials he submitted.  MD was issued a Written Supervision, without a prior Counseling Memorandum, for failing to report the abuse of a client.  Linder herself received a Written Supervision for crying when she learned that her client had been fired from his job.  And BW, like Plaintiff, received a Written Supervision for failing to document her schedule.  Indeed, the evidence demonstrates that AHRC Nassau was strict, if not unforgiving, in the enforcement of its policies, but that it did so in a non-discriminatory manner.

While Plaintiff argues that her supervisors' focus on Plaintiff's "attitude" and "lack of remorse" are subterfuge for racism (Pl. Closing Argument, Dkt. 101, at 20–21), the Court does not agree.  As an initial matter, the Court infers non-discrimination based on the fact that the three supervisors who played a role in hiring Plaintiff—Murgola, Linder and Maynard—were also involved in imposing disciplinary actions.  *See, e.g.*, *Carlton v. Mystic Transp.*, Inc., 202

F.3d 129, 137–38 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'") (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Furthermore, the Court did not perceive that these supervisors, each of whom testified at trial, were motivated in any way, either consciously or subconsciously, by racism or racial stereotyping. In addition, the record reflects consistent efforts by Plaintiff's supervisors to assist her in succeeding at her job and remaining with AHRC Nassau. (*See, e.g.*, Pl. Ex. 29 (Maynard meeting with Plaintiff after third Written Supervision); Tr. at 726; Def. Ex. GG (Simons not issuing Counseling Memorandum when she could have.)) The record further reflects the supervisors' recognition of Plaintiff's ideas, her contributions to AHRC Nassau, and her dedication to her clients, including, among other things, two positive performance evaluations and two "You Make a Difference" awards. (Pl. Exs. 3, 4, 47.) Such praise is inconsistent with racial animus.

Thus, the Court finds that the evidence fails to establish that AHRC Nassau discriminated against Plaintiff on the basis of race with respect to the adverse employment actions taken against her, and finds in favor of Defendant with respect to Plaintiff's Title VII claim.

B.     FMLA Retaliation Claim

Under the FMLA, it is illegal "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2); *see also* 29 C.F.R. § 825.220(a)(2) ("An employer is prohibited from discharging or in any other way discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the [FMLA].").

FMLA retaliation claims are analyzed under the familiar *McDonnell Douglas* framework.

*Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004); *see also Riddle v. Citigroup*, 449

Fed. App'x 66, 70 (2d Cir. 2011) (citing *Potenza*, 365 F.3d at 168).

### 1.  *Prima Facia Case*

To establish a prima facie case of FMLA retaliation, Plaintiff must show: (1) she

"exercised rights protected under the FMLA"; (2) she "was qualified for [her] position"; (3) she

"suffered an adverse employment action"; and (4) "the adverse employment action occurred

under circumstances giving rise to an inference of retaliatory intent." *Cooper v. N.Y. Nurses*

*Ass'n*, 847 F. Supp. 2d 437, 446 (E.D.N.Y. Mar. 16, 2012) (quoting *Potenza*, 365 F.3d at 168).

Since there is no dispute that Plaintiff was qualified to be an ETS and suffered adverse

employment actions, the only issues to be determined are whether Plaintiff exercised rights

protected under the FMLA and whether the adverse employment action occurred under

circumstances giving rise to an inference of retaliatory intent.

As discussed earlier, the Court finds that AHRC Nassau did not learn of A.M.'s

pregnancy until February 2009 and thus the first two Written Supervisions, which were issued in

late January 2009, could not have been the product of retaliation by Defendant on the basis of

Plaintiff's advocacy for A.M.'s FMLA rights.[41]

In any event, even if the Court were to find that AHRC Nassau learned of A.M.'s

pregnancy in January 2009, the Court nonetheless concludes that Defendant did not retaliate

against Plaintiff based on her advocacy for A.M.'s rights under the FMLA at any time.  Murgola

credibly testified that Plaintiff's advocacy was not related to any of Plaintiff's Written

Supervisions or termination.  (Tr. at 273–74.)  Although Plaintiff believes that her supervisors

---

[41] Notwithstanding this conclusion, Plaintiff could argue that the disciplinary actions
subsequently taken against her, including her termination, were in retaliation for her advocacy on
A.M.'s behalf.  That argument, however, is addressed by the Court's conclusion, set forth *infra,*
that no retaliation occurred at any time.

were upset about her efforts to secure A.M. benefits under the FMLA, no evidence of any such resentment or anger was adduced at trial. Plaintiff points to Linder's statement that A.M. was not likely to return to work after giving birth, and telling Plaintiff to look in the employee handbook to understand what A.M.'s rights were under the FMLA, as evidence of her supervisors' hostility toward Plaintiff's efforts on A.M.'s behalf. (Tr. at 106–07.) However, the Court finds that rather than evincing hostility toward Plaintiff's efforts, these actions constituted reasonable steps by Plaintiff's supervisors to direct and support Plaintiff in helping A.M. In response to an email from Plaintiff asking how to apply for FMLA benefits for A.M., Linder advised Plaintiff that "The employee handbook will explain in detail what [A.M.] is entitled to based on her length of time with the agency." (Tr. at 108; Def. Ex. Y.) Although Plaintiff perceived Linder's response as being dismissive and hostile (Tr. at 108), the Court does not agree with this interpretation based on the totality of the evidence.

The Court similarly does not find that Murgola's comment about taking a "step back" reflects anger or hostility over Plaintiff advocating for A.M. 's FMLA rights. (Tr. at 166–68; Pl. Ex. 33.) The phrase was contained in an email from Murgola responding to Plaintiff's suggestion about taking certain actions with respect to A.M.'s employment. (Pl. Ex. 33.) Murgola's email began with "Susan, I appreciate your advocacy on behalf of [A.M.], and understand her need for extra pay." *Id*. After addressing the specifics of Plaintiff's suggestion, Murgola concluded with "I really think we need to take a step back here and see how [A.M.] adjusts to returning to her regular work schedule." *Id.* Clearly, read in context, Murgola's "step back" statement was simply a recommendation that the entire team, and not just Plaintiff, be deliberative and patient, and see how A.M.'s work situation progressed before reevaluating the issues raised by Plaintiff. This statement could not reasonably be interpreted as evincing

hostility or resentment toward Plaintiff for advocating for A.M. At trial, Murgola explained that she meant that "we need to kind of take a step back from the situation and look at all factors that would contribute to [A.M.'s] timely return to work." (Tr. at 166–67.) Murgola credibly denied that she was telling Plaintiff to stop her advocacy on A.M.'s behalf, and denied that she was unhappy about Plaintiff's advocacy on A.M.'s behalf. (Tr. at 167.)

The evidence also demonstrates that, contrary to being hostile to Plaintiff's suggestions, Plaintiff's supervisors worked with Plaintiff to assist A.M. in obtaining FMLA benefits, and that Plaintiff's supervisors implemented and supported many of the measures for which Plaintiff advocated. For example, Murgola helped advocate for A.M. by suggesting to A.M.'s manager that A.M. take vacation time towards the end of her pregnancy so that she could reach the 12-month employment threshold to qualify for FMLA benefits. (Tr. at 275–76.) Murgola also spoke to A.M.'s manager about giving A.M. light duty assignments. (Tr. at 275–76.) When A.M. returned to work after her maternity leave, the majority of her hours were paid at a higher rate, one of the measures advocated for by Plaintiff. (Tr. at 111.) Murgola also positively recognized the many ways in which Plaintiff helped A.M. to qualify for FMLA benefits. (Tr. at 168.) Murgola described the assistance provided to A.M. as a "team effort." (Tr. at 168–69.)

Thus, the Court finds that there is no evidence that Plaintiff's supervisors were upset or angry over Plaintiff's efforts to obtain FMLA benefits for A.M. and that any adverse employment actions AHRC Nassau took against Plaintiff were *not* in retaliation for Plaintiff's advocacy on A.M.'s behalf. The Court therefore finds in favor of Defendant with respect to Plaintiff's retaliation claim.[42]

---

[42] Plaintiff's complaint also alleges a claim of retaliation under the Occupational Safety and Administration ("OSHA") laws. Plaintiff alleges retaliation under OSHA arising from her advocacy for heightened workplace safety measures for clients, including flash lights for use in

### III. Conclusion

In sum, Plaintiff has failed to prove by a preponderance that her race played any role in Defendant's termination of her employment. While the Court sympathizes with Plaintiff insofar as she feels genuinely aggrieved, there is no role for sympathy in adjudicating the facts or applying the law. *See, e.g.*, *Santiago v. Rapid Armored Corp.*, 04-CV-4721(NGG), 2006 WL 930543, at *3 (E.D.N.Y. Apr. 10, 2006) ("Although the Court is sympathetic to plaintiff's loss of her job after more than eighteen years, her claim that management is unfair does not establish a basis upon which to consider her [] discrimination claim."); *Fiore v. City of N.Y.*, 1998 WL 755134, at *2 (S.D.N.Y. Oct. 26, 1998) ("While we sympathize with plaintiff's difficulty in obtaining salary and other employment benefits to which he sincerely believes he is entitled," plaintiff was not entitled to such a remedy). "[E]ven if [AHRC Nassau] acted unwisely or erroneously," or indeed in a fashion with which the Court might disagree, there is no proof of racial discrimination in this case. *See Jones v. City of Mount Vernon*, 114 F. Supp. 2d 274, 283 (S.D.N.Y. 2000) (citing *Toliver v. Sullivan Diagnostic Treatment Ctr.*, 818 F. Supp. 71 (S.D.N.Y. 1993), *aff'd* 22 F.3d 1092 (2d Cir. 1994)).

Based on the entire record, the Court finds that the evidence fails to prove, by a preponderance, that Defendant AHRC Nassau discriminated against Plaintiff on the basis of race, or that it retaliated against her on the basis of her advocacy for her client's FMLA rights.

---

some buildings where the lights were turned off after work hours. (Dkt. 1 at 2.) However, as the Court previously ruled, OSHA provides no private right of action. *See, e.g.*, *Donovan v. Occupational Safety and Health Review Comm'n*, 713 F.2d 918, 926 (2d Cir. 1983); *see also Jones v. Staten Island Univ. Hosp.*, 04-CV-3302(JG), 2006 WL 2713987, at *1 (E.D.N.Y. Sept. 22, 2006) ("neither an OSHA violation nor retaliation against an employee for complaining of such a violation will support a cause of action under OSHA by an affected employee"). Accordingly, Plaintiff's OSHA claim is dismissed.

Accordingly, the Court issues judgment in favor of Defendant AHRC Nassau and dismisses this action with prejudice.  Each party shall bear its own fees and costs.

The Clerk of the Court respectfully is directed to enter judgment in Defendant's favor and terminate this action.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: October 4, 2013
        Brooklyn, New York